**STATE of Tennessee, Appellee,**

v.

**Ricky Alan JOHNSON,
Appellant–Defendant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Aug. 25, 1989.

Permission to Appeal Denied by Supreme Court Nov. 27, 1989.

Philip A. Condra, Dunlap, Howell G. Clements, Chattanooga, for appellant-defendant.

Charles W. Burson, Atty. Gen., Linda Ann Hammond, Asst. Atty. Gen., Nashville, J. William Pope, Dist. Atty. Gen., Pikeville, J. Michael Taylor, Asst. Dist. Atty. Gen., Dayton, for appellee.

## OPINION

DUNCAN, Presiding Judge.

The defendant, Ricky Alan Johnson, appeals his convictions of murder in the first degree (felony murder), armed robbery and aggravated kidnapping. He received a sentence of life, and two Range II sentences of seventy (70) years. All of his sentences are to be served concurrently with each other and with certain federal sentences for convictions that arose out of the incident.

In this appeal, the defendant claims that the prosecuting district attorney general violated an "immunity agreement," wherein he had been promised immunity from all state prosecution in exchange for information regarding a homicide˙which was suspected to have occurred in Sequatchie County. Also, the defendant claims that

even if he was not entitled to specific performance on the immunity agreement, his prosecution was barred because he was not given a speedy trial as required by both the federal constitution, the Constitution of the State of Tennessee, and by certain state statutes. Further, the defendant says that even if he was not entitled to specific performance on the immunity agreement, and even if his right to a speedy trial was not violated, all of the evidence which the State obtained as a direct result of his statements (given in reliance on the immunity agreement) should have been suppressed by the trial court.

Other issues raised by the defendant include: (1) whether he was entitled to a judgment of acquittal on the armed robbery or aggravated kidnapping charges; (2) whether he was placed in double jeopardy; (3) whether the trial court improperly failed to charge certain lesser included offenses; (4) whether the trial court erred by refusing to charge the jury with his special requests for jury instructions; (5) whether the testimony of an "expert witness" was erroneously excluded; (6) whether evidence of crimes for which the defendant was not indicted was improperly admitted at trial; and, (7) whether prosecutorial misconduct occurred during the closing argument.

We find no reversible error and affirm the judgments.

Although the defendant does not contest the sufficiency of the evidence, a summary of some of the evidence adduced at trial will be helpful in explaining some of our rulings on the issues that he does raise.

■ The State's evidence showed that on April 30, 1985, Mrs. Sharon Johnson (the defendant's wife), rented a motel room on Murfreesboro Road in Nashville, Tennessee, and four people gathered therein. This group consisted of Mrs. Johnson; and her husband, Ricky Alan Johnson (the defendant in this case); Darrell Smith; and his wife, Carol Ann Smith. On May 1, 1985, the four went to the Poole Truck Lines' Nashville terminal. When these four individuals saw a truck loaded with John Deere lawn tractors leave and head south on I–24 they followed it in Darrell Smith's car until they lost it on or near Monteagle Mountain.

Subsequently, while on their way back towards the truck terminal, they saw another truck loaded with a similar cargo. Using a citizens band radio, Sharon Johnson convinced the truck driver, Mark A. Williams, to give her a ride. Shortly after crossing the Georgia line, Williams pulled his truck over to pick up Sharon Johnson. Sharon Johnson had a pistol in her purse when she left the automobile. As Williams and Mrs. Johnson proceeded along the road, the defendant, Darrell Smith, and Carol Smith followed in the car.

Soon after getting in the truck, Sharon Johnson pulled the pistol out and required Williams to pull his truck over to the side of the road. The defendant and the Smiths pulled their car up to the rear of the truck, and the defendant and Darrell Smith got out and approached the truck.

According to the testimony of Darrell Smith, who testified for the State, the defendant took the pistol from his wife, and the two men got into the truck with Williams. Darrell Smith then drove the truck north towards Chattanooga, got on I–24, and headed back towards Nashville. The two wives got into the car and followed. After crossing the Marion County line the two vehicles exited the interstate. There the two vehicles stopped while Darrell Smith walked back to the car and got some rope with which to tie Williams. He also got a pillowcase or similar item which was placed over Williams' head. They got onto U.S. Highway 127 in Sequatchie County and later turned onto U.S. Highway 8, which goes towards the Cookeville area. Using the truck's citizens band radio the men told their wives, who were still following them in their car, to pass them when they came to the mountain and to wait for them at the top of the mountain. After their wives had passed them, the men pulled the truck off the pavement of the

road and came to a stop. Williams was removed from the cab and assisted over a guard rail and escorted over to the edge of a steep gorge. There, it is uncontroverted, the defendant struck Williams across the back with a pin hook with sufficient force to knock him down, and Williams fell over an embankment. The defendant and Darrell Smith concluded that since Williams could identify them he would have to die. They decided that each would shoot Williams and thereby share responsibility for his death. Further, according to Darrell Smith, he then proceeded to the location where Williams had fallen, but changed his mind and shot into the air. Defendant then left the truck with the pistol. Darrell Smith did not hear the gun fire, but the truck engine was running and he was nervous. At any rate, when the defendant returned to the truck, he indicated to Smith that he had shot Williams.

Shortly thereafter, they drove the truck to the top of the mountain and met Carol Smith and Sharon Johnson. Afterwards, they drove to Sparta, parked the truck, and returned in the automobile to the Smiths' home in Cookeville.

The next day, the truck was unloaded into a wooded area. Darrell Smith's brother-in-law assisted in unloading the lawn tractors off the truck. Over the next several days, Darrell Smith and the defendant sold these lawn tractors to various people, some of whom testified at the trial.

As a result of a statement given by the defendant to Federal and State authorities on August 26, 1986, the police found Williams' body in Sequatchie County in the general area where the defendant had indicated it would be found.

We note that the defendant's statement which implicated himself in these crimes was not introduced into evidence. We will comment further on this statement later in this opinion.

Suffice it to say, voluminous evidence was introduced at the trial to corroborate Darrell Smith's testimony.

Carol Smith also testified as a witness for the State and her testimony about the events that took place in her presence was consistent with Darrell Smith's testimony. The testimony of several witnesses established that the defendant was in possession of the stolen lawn tractors right after the theft and killing, and that the defendant participated with Darrell Smith in selling the stolen property over the days following the incidents.

From our review of the trial evidence, we find that it is overwhelming to show beyond a reasonable doubt that the defendant was a participant in the aggravated kidnapping of Williams, the robbery of him by taking his truck (and billfold which contained $5.00), and the cold blooded murder of him during the course of the commission of these other felonies.

The jury was unquestionably warranted in finding the defendant guilty beyond a reasonable doubt of all of these crimes.

The defendant first claims that the trial court erred in refusing to order specific performance of an "immunity agreement" entered into between him and the prosecuting district attorney general by which agreement he was promised immunity from all State prosecutions in exchange for information regarding the homicide in Sequatchie County of Mark Williams, a truck driver for Poole Truck Lines, Inc. Second, the defendant claims that even if he was not entitled to specific performance of the "immunity agreement," then the evidence that the State obtained as a result of his statement should have been suppressed. We find no merit to either claim.

The record of the hearings held on the defendant's various motions, including those on the question of the "immunity agreement," shows that almost immediately after the theft of the truck and lawn tractors, the F.B.I. commenced an investigation because the matter involved the theft of an interstate shipment of goods.

In July, 1985, Darrell Smith was indicted by the federal grand jury on the federal

charges involving the theft of the interstate shipment. He pled guilty to the federal charges, apparently in the fall of 1985. At that hearing, Smith claimed that Williams offered to sell the load to him because he wanted to disappear with a woman with whom he was having an affair. At this point, the law enforcement officials believed that the defendant was only involved in helping sell the goods which Darrell Smith had obtained.

The defendant turned himself in to the federal authorities on August 1, 1986, after having been indicted on the federal charges in February, 1986. He pled guilty to the federal charges on October 27, 1986, and at his sentencing hearing on November 20, 1986, Mr. Redick represented to the court that all of the information he had knowledge of indicated that the defendant "had no knowledge that this truck driver was going to die, and did not participate in any way in the killing of him."

Prior to the defendant's plea in federal court, the defendant, on July 2, 1986, submitted to a polygraph examination administered by F.B.I. Special Agent Robert P. Campbell. Agent Campbell's report states that the defendant "showed deception when answering questions concerning his involvement in the theft of the tractors."

At any rate, on August 26, 1986, while in federal custody, the defendant met in Nashville with Tennessee District Attorney General J. William Pope; his investigator, Larry Davis; Bill Redick and Don Dawson, both of the Federal Public Defender's office in Nashville; Derry Harper, Assistant United States Attorney; and Denny Bozella, an F.B.I. Special Agent.

Prior to this meeting, Mr. Redick, who was representing the defendant on his federal charges, had advised the federal officials that the defendant had information that he could furnish about the missing truck driver and indicated that Williams' body was located in Sequatchie County. It is quite clear from the record that the defendant, acting through his counsel, was desirous of making a confession, and was highly interested in trying to work out a deal with the federal and state officials on the problems that confronted him. At one of the hearings, the defendant's counsel, Mr. Redick, testified that the defendant was tired of the whole thing and wanted to confess, and that Smith had already given a statement to the F.B.I. about the theft, apparently implicating the defendant.

In any event, everyone who was present at this Nashville meeting and who testified in one or more of the various proceedings related to this defendant's trial has conceded that one of the reasons for this meeting was to consider whether or not to give the defendant immunity from prosecution concerning any murder or homicide charges that might otherwise result if the defendant gave the authorities information concerning Williams' disappearance (including information regarding the location of Williams' corpse).

■ Before the meeting began General Pope signed an "agreement," regarding the granting of immunity to Johnson. At some point later in the meeting, this "agreement" was also signed by General Harper. This agreement set out two lists. The first list included promises by the State and Federal authorities. This list of promises made by the two prosecutors originally included: (1) immunity from state homicide charges; (2) a three year "cap" on federal charges; (3) a recommendation from the prosecutors to the court that the time be served in the FCI at Lexington; and, (4) that state and federal time would be served concurrently. The defendant in exchange promised: (1) to answer truthfully regarding the disappearance of Williams; (2) to submit to a polygraph examination; (3) to "take the authorities to the location where the body was left as it was shown to him"; and, (4) a further promise that "he is not the individual that killed the Poole Truck Lines driver." This "agreement" was altered during the meeting to extend immunity from prosecution to all state charges, extend immunity to Johnson's wife, raise the "cap" on federal charges to four years,

and require that Johnson pass a polygraph test.

It is uncontroverted that at the beginning of the meeting all of the people present (except the defendant) thought that the defendant's role in the commission of the offense was merely that of helping Smith sell the lawn tractors. When the facts developed that Johnson needed protection from possible felony murder charges District Attorney General Pope agreed. It was at this point that the "agreement" was altered by striking through the section granting immunity from a state murder prosecution. Then, above this section was added the phrase "agreement not to prosecute any charges."

Satisfied that whatever he might then say would not be used to convict either him or his wife on state charges, and might reduce the time that he would otherwise be given on the federal charges, Johnson related that he had participated in the robbery, kidnapping, and murder. He admitted that he had struck Williams with a pin hook and knocked him to the ground, but denied that he was the one who actually shot him. Further, he described the location of Williams' corpse.

The following day, August 27, 1986, the police found Williams' corpse in the general area where the defendant said it would be found. Also, on this day without the presence of, but apparently with the consent of his counsel, Mr. Redick, the defendant gave another statement which basically followed the details of his August 26, 1986 statement.

On September 11, 1986, the defendant submitted to a second polygraph examination and according to F.B.I. Special Agent Campbell, the defendant again showed deception on certain questions related to his involvement in the murder.

Approximately two weeks after giving the location of Williams' corpse and sixteen months after the incident, the defendant and Darrell Smith were indicted for premeditated first degree murder, felony-murder, armed robbery, and aggravated kidnapping. Carol Smith and Sharon Johnson were indicted for armed robbery, aggravated kidnapping, and accessory before the fact to first degree murder. Immediately thereafter, District Attorney Pope, when questioned by the defendant's counsel, who had been appointed to represent him on the state charges, stated that the indictments were just to make certain that the defendant testified regarding this incident.

As indicated, on October 27, 1986, the defendant pled guilty in federal court to theft of an interstate shipment and on November 20, 1986, he received a federal penitentiary sentence of six years and was ordered to pay partial restitution. (The federal prosecutors raised the four year "cap" on the suggested sentence which had previously been agreed to during the August 26, 1986, meeting to a six year "cap" on the sentence because of the defendant's failure to unequivocally pass the F.B.I. administered polygraph examination.)

In June of 1987, and on various other dates which are not set out with precision in the record before this Court, District Attorney Pope stated that he was going to honor his "immunity agreement" with the defendant. On October 27, 1987, Darrell Smith entered a guilty plea to second degree murder and aggravated kidnapping. He received concurrent sentences of seventy years for each conviction, and these sentences were ordered to run concurrently with his federal sentences.

Two days later, by a letter dated October 29, 1987, the defendant's counsel were informed that the immunity "agreement" that had previously been entered into was not going to be honored because:

I [District Attorney General Pope] am sure you realize that we now possess the statements of both Darrell Smith and Carol Ann Smith which refute the statement of your client, Richy [sic] A. Johnson. You were in court at Dunlap on Tuesday last when Darrell Smith entered his pleas of guilty to Murder and Aggravated Kidnapping and in which part of

the agreed plea was his truthful testimony against your client, Mr. Johnson. Carol Ann Smith will likewise testify against your client. It is my opinion that your client, Ricky A. Johnson, has not been truthful in regards to his involvement in this matter, that he was not corroborated by the polygraph examination as agreed, that he knew where the body was at all times because he helped put it there, and that he, in fact, did kill Mark A. Williams.

Therefore, I am rescinding and terminating any previous agreement of immunity and do intend to prosecute Ricky A. Johnson for the murder of Mark A. Williams.

Regarding the "immunity agreement," General Pope testified that he concluded that the defendant had breached the agreement by being untruthful, and therefore, he did not believe he was under any obligation to be bound by it. However, General Pope stated that in fairness to the defendant, the State did not intend to use the defendant's statement in evidence at the trial.

It was the defense's position that the defendant had not been untruthful in any material regard, and therefore, the State should be required to fulfill the "immunity agreement."

The trial court rejected the defendant's contention that the State should be barred from prosecuting him. The trial court found that:

> The clear evidence presented to the court reveals that there was substantial and material misstatement by the defendant Johnson during the August 26, 1986 meeting and that he was not in the truck at the time Mark Williams was killed but was in fact a participant. This conclusion is based on the fact that both General Pope and Bill Redick testified that Johnson had said that Smith left the truck for a short period of time and during this period of time he heard gunshots. I am convinced that the attorney general was correct in his conclusion that

Johnson might well be involved in the murder and that the element of good faith was missing in his plea for immunity.

From our review of the entire record, we find that the evidence does not preponderate against the trial court's finding.

The defendant appears to relate this issue to plea agreements. An "immunity agreement" of the type involved here is not the same as a plea bargain or agreement. In *Mabry v. Johnson,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984), the United States Supreme Court, after stating that a "plea bargain standing alone is without constitutional significance," continued by stating that a plea bargain is merely an "executory agreement which, until embodied in the judgment of the court, does not deprive an accused of liberty or any other constitutionally protected interest." 104 S.Ct. at 2546.

■ Also, even a plea bargain is revocable and unenforceable until accepted by the trial court. *Mabry, supra; State v. Turner,* 713 S.W.2d 327 (Tenn.Cr.App.1986); *Matheny v. State,* 589 S.W.2d 943 (Tenn. Cr.App.1979).

Additionally, we point out that Tennessee has no statute that authorizes the type of "immunity agreement" under discussion here.

Our Supreme Court in *Bruno v. State,* 192 Tenn. 244, 240 S.W.2d 528 (1951) has held that an "immunity agreement" of this nature is of no legal effect. In *Bruno,* our Supreme Court was concerned with a case where a police officer promised a defendant immunity from prosecution in exchange for the defendant's statement about a crime. In holding that the immunity promise was not binding on the State, the court approved the following quotation from 22 C.J.S., *Criminal Law,* § 46, page 105:

> In the absence of a statute providing for immunity, the fact that a participant or accomplice in the commission of a crime testifies or agrees to testify on behalf of the prosecution, fully and fairly disclos-

ing the guilt of himself and his associates, with the understanding or promise, express or implied, that he will be granted a pardon or will not be prosecuted for his offense *does not* entitle him to a pardon or immunity as a matter of right; and such facts may not be pleaded in bar of a prosecution. *Id.* 192 Tenn. at 249–50, 240 S.W.2d at 530.

The *Bruno* Court continued by saying:

We have no such statute in this State granting immunity to an accomplice who gives the State aid in the prosecution or apprehension of his co-workers in crime. Probably the leading case in the United States on the question is *U.S. v. Ford,* 99 U.S. 594, 25 L.Ed. 399.

Therefore, as we view the matter, since there is no statute on the subject in this State, there is nothing that we as a Court can or should do about this promise of immunity that the plaintiff in error claims. *Id.* 192 Tenn. 250, 240 S.W.2d at 530–31.

As the *Bruno* Court did, we likewise conclude that the "immunity agreement" under discussion was unenforceable.

■ Also, we must reject the defendant's claim that the State's evidence should have been excluded because it was derived from his involuntary statement.

■ Certainly, a defendant's constitutional rights would be violated if the promise of immunity is used in an improper way so as to extract a statement from him which implicates him in the crime. But this would result in relief for a defendant, only if his statement was used in evidence against him at his trial, or if his statement results in him disclosing evidence that is used at trial which the State could not have otherwise obtained or developed from independent sources or discovered in a lawful manner.

As previously indicated, the State did not introduce the defendant's statement at trial, so this only leaves the question of whether the State's evidence was tainted, by reason of the defendant's statement, to such an extent that it should have been excluded.

In the defendant's statement, he implicated himself, Darrell Smith, and their wives in the theft of the truck and lawn tractors and made statements about his and Darrell Smith's participation in the actual murder of Williams. He stated, in addition to other things, that after he and Darrell Smith got in the truck with Williams, they drove "to Highway 8 in Sequatchie County and pulled over." He said that they took Williams "across the guard rail," and that both "hit him once in the back of the shoulder with a blunt object," and that Williams fell down "towards the gorge."

From our reading of the trial evidence, and as we summarized at the beginning of this opinion, we are led to the conclusion that all of the State's evidence was either developed from sources apart from the defendant's statement or would have been inevitably discovered by the State in a lawful manner.

In *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) the United States Supreme Court held that "[t]he independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." 104 S.Ct. at 2508. The Court further held that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." 104 S.Ct. at 2509. The *Nix* case also stands for the proposition that the prosecution is not required to "prove the absence of bad faith." 104 S.Ct. at 2509.

The record shows that prior to the defendant's statement in August, 1986, the F.B.I. had conducted an extensive investigation and had developed many leads and potential witnesses. The authorities knew that the truck had been hijacked on May 1,

1985. The F.B.I. had commenced an investigation as early as May 3, 1985, and had information that the defendant and Darrell Smith had been in possession of and had been selling the stolen lawn tractors soon after the theft. The authorities knew that Darrell Smith had already pled guilty to the federal charges, and that the defendant had already been indicted by the federal grand jury. In addition to knowing much other information about the incident, they knew that Williams had been missing for over fifteen months, and that he likely had met with foul play. Also, before the defendant's statement, the Assistant United States Attorney had been advised by the defendant's counsel that Williams' body was at some location in Sequatchie County. The record indicates that General Pope had been made aware by the federal authorities of the above matters prior to his meeting with them and the defendant in Nashville on August 26, 1986.

Thus, it is obvious and most logical that even without the defendant's statement, the State's investigation would have proceeded and would have uncovered substantially the same evidence that was in the defendant's statement.

The defendant particularly urges that absent his statement, the State would not have ever discovered Williams' body. We disagree.

In his testimony at the hearing on the defendant's motions, General Pope indicated that he believed that the information he had received from independent sources, apart from the defendant's statement, would have allowed the State to discover Williams' body. General Pope testified:

We had a homicide and we had been led to believe and given enough indication that it had, that Sequatchie County was a center piece. You had evidence, as I went over with Mr. Clements this morning, that the truck had been enroute from Nashville, Tennessee to a destination in Florida down I–24 and that it had been seen in the late hours of that evening, May 1st, coming back in the west

bond lane towards Jasper, Tennessee. So there's some evidentiary nature there.

Then you have the fact that the truck was found abandoned in Albany, Kentucky, right across the line above Jamestown or Birdstown. You have the fact that the tractors in question were positively identified through serial numbers and other reasons, they were painted over, but not a very good concealing job, were found in the Putnam County—White County area. You had, in essence, you had Ricky and Darrell cold on those, or the federal government did.

So you know, you know where your route are. [sic] Now we had already been led to believe that [sic] Sequatchie County, so when you're coming through Sequatchie County, if you're going to Cookeville, Tennessee or Sparta, Tennessee or Rickman, Tennessee, or even Albany, Kentucky—well, I take that back. You could go to Albany, Kentucky through Pikeville and on up 127, but if you're going to Cookeville, obviously these tractors had to be off loaded. If you're going to the White County, Putnam County area to off load these tractors from this flatbed truck, this truck that's carrying them, then the only route that you would go would be up 127—excuse me, up 27 to—up 28, I'll get it in a moment. It's not state 28, up state 28 to 127 here in Dunlap, take a left at Highway 8 north of Dunlap two (2) miles north of the courthouse here, go across the mountain which is a combination 108 and 111 takes you by, by-pass Spencer, down into Sparta and on into Cookeville on 111.

Well, if you know this area as well as I do, the fact that if you come up from Jasper, 28, and as you get on 127 is highly populated. There's not a whole lot of rural area there and there's a lot of movement around there. So if there had been a body there for fifteen (15) or sixteen (16) months, somebody would have obviously found it much quicker. Okay, when you get out of the valley you turn, if you're going that route, you go

up Highway 8. Well of course, the most obvious place to pull over is the big overlook. It's a big area there on the side of the mountain on the new highway that was built to replace old Highway 8. There's a sheer rock cliff on the right if you're going upward the mountain, a sheer cliff almost all the way from the bottom of the mountain up to the top of the mountain, and then this big wide area that you pull over that's fairly elongated and there's a big ravine down there. Now admittedly there are hikers and hunters and occasionally a car will run off there, but we would have started a search. You know, I can't say with any degree of accuracy how long it would take to find something, but I know where we would have been searching and that place would have been one of the first places that we would have searched, the Highway 8 overlook area where the body actually was found and we would have authorized a search in Sequatchie, utilizing all the police facilities, sheriff's office, police department, highway patrol, TBI, et cetera, plus Sequatchie County had one of the best rescue squads. In fact, they aided in bringing the remains of this body and sending people up and down the gorge later on after the body was found and they are one of the best rescue squads in the state and have been so recognized, and certainly we would have availed ourselves of their facilities.

. . . . .

I think the body would have been found, because with the tractor-trailer truck in question and the large size it is, obviously that truck went on and I think that the body would have been found, because there's only so many places if you're looking for the perimeters of a major arterial system, highway, that you would find it. Of course, there's always a chance you go off on a dirt road or something, a logging road, but that's highly unlikely, especially in light of the vehicle question. I think we would have found it, yes.

Further, T.B.I. Agent Bill Barbrow, testified that, apart from the defendant's statement, he "knew basically what information everybody had up to the point that the search started," and that searches would have been conducted.

In explaining what he would have done, discounting the defendant's statement, Agent Barbrow testified:

Provided the information that I had, starting with is where the truck supposedly went over in the Cookeville area, was spotted on I-24 west bound on the west side near the bridge and I knew that somewhere from there to Cookeville would have to be a body and if it was in Sequatchie County, the only place, the only logical places to search would be from the county line up on 28 and from the foot of the mountain up to the Van Buren County line on Highway 8.

Further, Agent Barbrow, when asked if he felt Williams' body would have been found, said:

Yes, sir, I think we could. It might have took some time searching, because we would have had to have started at the county line and worked our way to the Van Buren County line, but I feel like we most likely would, because I know where it was.

The witness also indicated he would have had available helicopter search teams to aid in the search, and that in the fall time when the leaves fell, the area would have been more visible.

Based on all of the evidence, the trial court found that Williams' body would have been inevitably discovered even without the defendant's statement. We agree. We are bound by the trial court's ruling unless the evidence preponderates against it, and we find that it does not.

We hold that the trial judge properly overruled the defendant's motion for specific performance of the "immunity agreement" and his motion to suppress the evidence. The evidence does not preponderate against the trial court's rulings on these motions.

Next, the defendant contends that he was denied his right to a speedy trial.

In the case of *State v. Bishop*, 493 S.W.2d 81 (Tenn.1973), our Supreme Court adopted the four (4) part test of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), as the proper method for determining whether a defendant has been denied his constitutional right to a speedy trial. These four (4) factors include: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of his right to a speedy trial; and (4) whether the accused was prejudiced by the delay. No single factor is determinative in all cases, but the most crucial inquiry is whether the delay has prejudiced the defendant. *Tillery v. State*, 565 S.W.2d 509 (Tenn.Cr.App.1978).

 The delay between the defendant's indictment and trial was nearly twenty-one months.

The reasons for the delay are fairly obvious. The district attorney general candidly conceded that part of the delay was due to his struggle with his conscience as to the appropriateness of the "immunity agreement." We note that in his ruling on the speedy trial question the trial court stated that "General Pope's struggle was justified because the court would not have approved the immunity agreement on the facts presented." Also, as the trial court found, General Pope desired "to obtain a conviction on both defendants Johnson and Smith," and that "he delayed proceeding against Johnson until he obtained a plea from Smith."

Thus, the record is fairly clear that the State was not desirous of a speedy resolution of the defendant's case. But, at the same time, as we review the record, the defendant was in no rush either to get a disposition of the charges in the indictment, and understandingly so, as he was relying on the "immunity agreement" to exculpate him from all charges.

Nonetheless, the defendant was represented by capable and experienced counsel, and they were likely aware of the legal uncertainty as to the validity of the "immunity agreement." The trial court alluded to this in its ruling but still concluded that the defendant neither acquiesced in nor approved the delay.

As to the defendant asserting his right to a speedy trial, he filed a motion on May 11, 1988, to dismiss the indictment for lack of a speedy trial. In a prior motion filed on December 28, 1987, he referred, among other things, to the fact that by relying on the "immunity agreement," which the State had revoked, he had lost a valuable trial tactic by not filing a motion for a speedy trial. At any rate, the defendant was tried in June, 1988, shortly after making his first unequivocal request for a speedy trial.

Finally, we come to the most significant factor in determining this issue, and that is whether the delay prejudiced the defendant. *Barker, supra,* 92 S.Ct. at 2193; *Tillery, supra,* 565 S.W.2d at 510.

The trial court, in its ruling, correctly dealt with this question of whether prejudice resulted to the defendant by reason of the delay. The trial court found that the defendant "lost nothing by reason of the delay," and concluded by stating:

Although defense Counsel argues that effective preparation of its case has been hindered by the delay, including the opportunity to interview witnesses, the defense can point to no specific area where the defendant was actually prejudiced. No witnesses were lost to the defense by reason of the delay nor was any physical evidence lost to the defense. Of course, the defendant Smith would now have to testify without the benefit of being able to claim Fifth Amendment immunity, but the defendant cannot claim another person's constitutional right as that of his own, much less claim it as prejudice. Consequently, I cannot conclude that his right to a speedy trial has been violated.

We find that the record sufficiently supports the trial court's findings.

Further, as we have indicated, the State's evidence is overwhelming to show

the defendant's guilt. In *State v. Bishop*, 493 S.W.2d at 85, our Supreme Court suggested that the strength of the State's case as to a defendant's guilt should be considered in judging the factors in the balancing test.

Thus, after considering all of the circumstances of this case and after balancing the *Bishop–Barker* factors, we agree with the trial court that the defendant was not denied his constitutional right to a speedy trial.

■ Additionally, the defendant faults the trial court for excluding the testimony of Leroy Phillips. The defendant wanted Mr. Phillips, an experienced criminal law attorney, to testify as an expert witness regarding prejudice that resulted to the defendant from the State's delay in bringing the defendant's case to trial. The defendant offered this witness at the pretrial hearing on his motion to dismiss for failure to be granted a speedy trial.

Before the admission of the testimony of an expert witness is justified, the subject under examination must be one that requires the trier of the fact to seek the aid of a person experienced or knowledgeable in the field. *Casone v. State*, 193 Tenn. 303, 246 S.W.2d 22 (1952).

Obviously, the able and experienced trial judge in this case did not need the opinions of another legal expert as to whether the facts demonstrated prejudice. The trial judge properly exercised his discretion in excluding this proffered evidence.

■ In another issue, the defendant claims that the trial court should have charged on the offense of aggravated assault and battery as a lesser included offense of the felony-murder count of the indictment.

As our prior summary of the evidence demonstrates, it clearly shows the defendant's guilt of the murder of Williams which was committed during his commission of kidnapping and robbing the victim. Since the evidence established the greater offense, there was no requirement to charge on a lesser included offense. *State v. McKinney*, 605 S.W.2d 842 (Tenn.Cr. App.1980). This issue is overruled.

The defendant also argues that the trial judge erred in failing to charge the jury on his special requests for instructions, regarding the law on aiding and abetting and on causation.

The trial court's jury instructions adequately covered the applicable law on these subjects. It is not error to refuse a special request where the charge as given fully and fairly states the applicable law. *Edwards v. State*, 540 S.W.2d 641 (Tenn.1976); *State v. Rogers*, 703 S.W.2d 166 (Tenn.Cr. App.1985). We find no merit to this issue.

■ Next, the defendant says that his convictions for both felony murder and the underlying felonies subjected him to double jeopardy. Essentially, he argues that his convictions for the underlying felonies of armed robbery and kidnapping should merge with his conviction for felony-murder.

The offenses of kidnapping, armed robbery and felony-murder are all proscribed by different statutes and provide separate punishments.

In *State v. Blackburn*, 694 S.W.2d 934 (Tenn.1985), our Supreme Court, in dealing with this exact issue, held that there is no constitutional prohibition to punishment for violation of two separate criminal statutes dealing with the same conduct.

In *Blackburn*, the defendant claimed that the constitutional prohibitions against double jeopardy prevented the imposition in a single trial his dual convictions for felony-murder and assault with intent to rape.

In *Blackburn*, the Court stated that where multiple convictions for separate statutory violations are had in a single trial, "the key issue is whether the legislature intended cumulative punishment." *Id.* at 936. In concluding that the two statutes were directed to separate evils, the Court stated:

[T]he legislature intended that multiple punishments be imposed on conviction of a defendant for felony murder and for the underlying felony.

*Id.* at 937. *See also State v. Brown,* 756 S.W.2d 700 (Tenn.Cr.App.1988), where, following *Blackburn,* we approved dual convictions for felony-murder and armed robbery.

The defendant cites the case of *State v. Warren,* 750 S.W.2d 751 (Tenn.Cr.App. 1988) for the proposition that either the armed robbery conviction or the kidnapping conviction should merge with the defendant's felony-murder conviction.

In *Warren,* our Court was concerned with a defendant who had been convicted of armed robbery, aggravated kidnapping, and grand larceny. We vacated the grand larceny conviction because it and the armed robbery conviction were based on facts showing that the victim's purse and vehicle were taken at the same time, and we concluded that the taking of both items were parts of a single continuing criminal act, inspired by the same criminal intent.

The facts and situation in the present case are unlike those in *Warren.* First, we point out that *Warren* did not involve a felony-murder conviction, as does the present case. Also, while *Warren* involved the same intent as such related to the defendant's larceny and robbery offenses, the aggravated kidnapping and robbery incidents in the present case involved different intents. Further, the facts in the present case show that Williams was initially kidnapped and thereafter he was robbed of his truck, the lawn tractors and his billfold. Thus, we have separate offenses here that involved separate intents, and which are proscribed by different statutes.

Also, it is significant to note that in *Warren,* we approved the defendant's convictions for both armed robbery and aggravated kidnapping, the same offenses for which the present defendant now says should be the subject of merger.

We find no merit to this issue.

■ We find no merit to the defendant's issue regarding the admission of testimony from several witnesses about their purchase of the stolen lawn tractors from the defendant.

This evidence was material and probative on the defendant's motive for the murder, and it further tended to prove that the defendant committed the armed robbery. *See, Collard v. State,* 526 S.W.2d 112 (Tenn.1975). This evidence was admissible to "complete the story." *See, Shockley v. State,* 585 S.W.2d 645 (Tenn.Cr.App.1978); *Hull v. State,* 553 S.W.2d 90 (Tenn.Cr.App. 1977).

■ Finally, the defendant complains about the prosecuting attorney's closing argument to the jury where he stated that he thought the defendant and the codefendants were equally guilty and that was why he was not asking for the "electric chair" for the defendant. He also argued that he made an agreement with a "less culpable" one to "get the ball rolling."

The trial court gave a cautionary instruction to the jury telling them that attorneys should not inject their personal opinions into their argument, but should only argue in general terms of their case theories.

Given the overwhelming evidence showing the defendant's guilt, this error unquestionably was harmless and did not affect the jury's verdict. Tenn.R.Crim.P. 52(a); T.R.A.P. 36(b).

All of the defendant's issues are overruled. The judgments are affirmed.

BIRCH and WADE, JJ., concur.