IN THE SUPREME COURT OF TENNESSEE

AT NASHVILLE


| STATE OF TENNESSEE | ) | FOR PUBLICATION |
| | ) | |
| Appellee | ) | FILED: OCTOBER 9, 1995 |
| | ) | |
| vs. | ) | No. 01-S-01-9407-CC-00073 |
| | ) | |
| DAVID EDWARD HOWINGTON | ) | John H. Gasaway, Judge |
| | ) | |
| Appellant | ) | Montgomery County |

For Appellee:

Charles W. Burson
Attorney General & Reporter

Kimbra R. Spann
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0485

For Appellant:

Gregory D. Smith
One Public Square, Suite 321
Clarksville, TN 37040

O P I N I O N

REVERSED; SENTENCE VACATED; REMANDED                    Birch, J.

The district attorney general refused to honor an informal immunity agreement[1] made with David Edward Howington, the defendant. The reason stated for this refusal was the prosecutor's perception that Howington had not fulfilled his part of the bargain; that is, he had not testified truthfully at his preliminary hearing.  He was subsequently tried and convicted of first-degree (felony) murder; he received a life sentence.

The Court of Criminal Appeals affirmed the conviction; we granted Howington's application for review under Rule 11.  At issue is whether the agreement between Howington and the district attorney general is enforceable and, if so, to what extent and with what result.

For the reasons discussed below, we hold that informal agreements between a prosecutor and a defendant are judicially

---

[1]In the case under submission, the agreement cannot be described as including a promise of "immunity" in the purest sense. The district attorney general promised merely to recommend to the magistrate who conducted the preliminary hearing that Howington be bound to the grand jury on second-degree murder instead of first-degree murder as the warrant charged.  Perhaps the agreement is more accurately described as a cooperation-immunity agreement, or as a charge-bargain agreement.  Thus, we use the three terms generically and interchangeably.

enforceable. In so holding, we expressly overrule Bruno v. State, 240 S.W.2d 528 (Tenn. 1951), to the extent that it can be read as precluding judicial enforcement of immunity agreements under all circumstances. Accordingly, we reverse the conviction for first-degree murder.

I

As for the salient facts, including those which by motion the defendant requests that we consider, the record indicates that Tony DeVito[2] and the defendant had information that Michael Trobaugh, the victim, had recently received a large sum of money and desired to purchase a quantity of marijuana. DeVito, a supplier of marijuana, and the defendant planned to fill the victim's marijuana order and to rob him of his money at the same time. In their discussion, DeVito suggested that they "leave no witnesses."

Several hours later, the victim led the defendant and DeVito to his trailer and invited them in. Once inside, the victim produced a large sum of cash that he intended, apparently, as

---

[2]DeVito was subsequently convicted of first-degree (felony) murder upon evidence which included Howington's preliminary hearing testimony.

payment for the marijuana. As the parties were so situated, and at a time when the defendant was seated next to the victim in the living room, DeVito stood behind the victim and shot him in the head. DeVito and Howington, grabbing the cash and the victim's wallet, fled. Unaware, apparently, that Howington had already taken a substantial amount of the victim's money, DeVito gave him $500 of the contraband and admonished him to "keep [your] mouth shut." Trobaugh died from the wound inflicted.

The perpetrators then went to DeVito's house where they burned blood-stained items of their clothing, washed the blood from the money, and cleaned the firearm.

Before the preliminary hearing, the district attorney general and the defendant, through counsel, entered into an unwritten agreement. In exchange for Howington's truthful testimony at his preliminary hearing, the district attorney general agreed to recommend that he be bound to the grand jury on second-degree murder instead of the original charge of first-degree murder. Additionally, the district attorney general agreed to recommend the defendant's release on an appearance bond in the amount of $50,000.[3] Apparently, the State needed Howington's testimony to bolster its case against DeVito. At his preliminary hearing, the defendant

_____

[3]We deem it unnecessary to address this part of the agreement.

4

testified; he fully incriminated DeVito--he fully incriminated himself.

In his testimony, the defendant stated that he had received only the $500 DeVito had given him. However, other evidence adduced during the preliminary hearing suggested that the defendant had ended up with approximately $4,500 of the victim's money. Although the district attorney general accepted as true Howington's testimony in every other particular, he concluded that Howington had lied about the amount of the victim's money he had received. Acting on this conclusion, the district attorney general considered the State no longer bound by the agreement, and he so informed the defendant. Neither of the agreed recommendations was made, and the magistrate bound Howington to the grand jury on the charge of first-degree murder. Subsequently, the grand jury indicted Howington on first-degree murder--both felony and premeditated.

In a pretrial motion, Howington sought to prevent his preliminary hearing testimony from being admitted into evidence at his trial on the ground that it had been "impermissibly compelled" and was, therefore, not "voluntary."

Following a hearing, the trial court characterized the incriminating portion of the testimony as a "confession." The trial

5

court ruled that it had been voluntarily obtained and was, therefore, admissible. The trial court found also that Howington had not fulfilled a "condition precedent" of the agreement--that he testify truthfully. As a result of this ruling, Howington's preliminary hearing testimony was admitted as a part of the State's case-in-chief during Howington's jury trial for first-degree murder. As stated, the jury convicted Howington of first-degree (felony) murder.

On appeal to the intermediate court, Howington insisted that the trial court erred in permitting the State to introduce, in its case-in-chief,[4] his preliminary hearing testimony on the ground that the State had obtained it by promise of reward. The intermediate court considered Howington's insistence and concluded that the trial court erred in allowing his preliminary hearing testimony to be admitted in the trial because "the behavior of the state's law enforcement officials was such as to overbear petitioner's [Howington's] will to resist and bring about confessions not freely self-determined." Nevertheless, in light of the other evidence, the court found the error harmless beyond a reasonable doubt.

---

[4]Howington conceded the State's right to use this testimony for impeachment purposes should he testify.

Before this Court, Howington advances three contentions: First, he invites us to overrule Bruno and, by so doing, to authorize the judicial enforcement of agreements such as the one here pertinent. Second, he contends that the perceived untruthful testimony was not a sufficient reason for the State's refusal to honor the agreement. Third, he insists that were we to reject his first two contentions, we should find that the admission of his testimony was reversible error.

The State, on the other hand, argues that sound policy reasons support Bruno, and it should not be overruled. Additionally, the State contends that Howington breached the agreement in a material way and is not entitled, therefore, to relief. Moreover, the State insists that admission of the testimony was proper because it had been voluntarily given.

For the reasons herein discussed, we hold that agreements between defendants and prosecutors are enforceable in much the same way as other contracts. This holding requires that we overrule Bruno.[5] We do that now. Further, we find that Howington reasonably fulfilled his part of the agreement with the predictable result that DeVito's conviction, as Howington's, was aided, if not procured, through the State's use of Howington's testimony.

---

[5]240 S.W.2d 528 (Tenn. 1951). As we stated above, Bruno is expressly overruled to the extent that it can be read as precluding judicial enforcement of immunity agreements under all circumstances.

7

As stated above, the issue we now address is whether the agreement is enforceable. Because our analysis of this issue provides relief for Howington, we need not reach the issue of the admissibility of his preliminary hearing testimony.

The traditional rule in Tennessee is that informal immunity agreements are not enforceable. See Bruno v. State, 240 S.W.2d 528 (Tenn. 1951); State v. Johnson, 781 S.W.2d 873 (Tenn. Crim. App. 1989). In Bruno, which involved an informal immunity agreement between the defendant and a police officer, the Court reasoned:

> "In the absence of a statute providing for immunity, the fact that a participant or accomplice in the commission of a crime testifies or agrees to testify on behalf of the prosecution, fully and fairly disclosing the guilt of himself and his associates, with the under-standing or promise, express or implied, that he will be granted a pardon or will not be prosecuted for his offense *does not* entitle him to a pardon or immunity as a matter of right; and such facts may not be pleaded in bar of a prosecution." We have no such statute in this State granting immunity to an accomplice who gives the State aid in the prosecution or apprehension of his co-workers in crime.

240 S.W.2d at 530 (citation omitted).  However, the Court implied that had the district attorney general made a promise that was within his or the court's authority, the agreement would have been enforceable.  The Court stated:

> Normally, where such a promise is made in good faith and the party who then cooperates and gives the State the necessary assistance the district attorney general may with the consent of the trial court take care of the matter, but when it has not been done in this way the only thing that we know that can be done is that the Chief Executive must be convinced that this is a case for the lending of his pardoning power.

Id. at 531.  Thus, while concluding that informal immunity agreements[6] are not enforceable, the Court alluded to circumstances under which they would be.

Although the facts in Bruno involve a pure immunity agreement between an accused and a police officer, the Court of Criminal Appeals found that the reasoning therein also supported the rule as applied to an agreement with a district attorney general. State v. Johnson, 781 S.W.2d 873 (Tenn. Crim. App. 1989).  In Johnson, the district attorney general signed an immunity agreement with the defendant providing, among other things, for immunity from

---

[6]We use the phrase "informal immunity agreement" generically to include all agreements between the State and an accused regarding charge, plea, or sentence.

9

state homicide charges in return for truthful cooperation. The court held that under <u>Bruno</u> "an 'immunity agreement' of this nature is of no legal effect." <u>Id.</u> at 879.[7]

Thus, traditionally, immunity agreements of the sort here considered have generally been unenforceable in Tennessee. In recent years, however, both state and federal prosecutors have resorted to the use of cooperation-immunity agreements in ever-increasing numbers. In this respect, these agreements, as do plea agreements, have a significant role in the prosecution of those accused of crime. By resorting to such agreements, prosecutors are often able to use agreements with "minor actors" to move against "major actors." Without this tool, prosecutors would often be unable to prosecute some of the worst and most dangerous offenders.

Plea agreements, unlike immunity agreements, have been treated as contracts and are enforceable once the condition precedent is met; that is, the trial judge accepts the agreement. <u>State v. Street</u>, 768 S.W.2d 703 (Tenn. Crim. App. 1988); <u>Metheny v.</u>

---

[7]We note, however, as the Court of Criminal Appeals did, that the <u>Johnson</u> court did find that "a defendant's constitutional rights would be violated if the promise of immunity is used in an improper way so as to extract a statement from him which implicates him in the crime." 781 S.W.2d at 880. This concern for the protection of constitutional rights resulted in the rule that if the defendant's statements were coerced by the promise of leniency, the statements and evidence obtained by way of the statements cannot be used by the State in its case-in-chief. We note that in <u>Johnson</u>, the trial court determined, after a hearing, that Johnson had breached the agreement by being untruthful.

10

State, 589 S.W.2d 943 (Tenn. Crim. App. 1979). This is consistent with basic contract principles that an agreement does not become binding until the condition precedent has been met. See Covington v. Robinson, 723 S.W.2d 643 (Tenn. Ct. App. 1986); Strickland v. City of Lawrenceburg, 611 S.W.2d 832 (Tenn. Ct. App. 1980).[8]

We find no substantive difference between a plea agreement and the charge agreement we have here. Both agreements enhance the State's efforts to prosecute crime. Both types of agreements may require a defendant to give up important rights, such as the right to trial by jury or the right against self-incrimination. Here, Howington surrendered the constitutional right against compelled self-incrimination. At the preliminary hearing stage, no discernable urgency existed for Howington to testify. The magistrate could have, and more likely would have, bound him over on the original charge anyway; that is, without his testimony. Obviously, the big winner was the prosecution, for it received much of the evidence necessary to convict both Howington and DeVito, irrespective of the truth or falsity of Howington's testimony as it regards the amount of money he received.

---

[8]It should be noted that even though the plea agreement is not enforceable until it has been accepted by the trial judge, the trial judge must allow the defendant to withdraw his guilty plea in the event that it is not accepted. Tenn. R. Crim. P. 11(e)(4). This prevents the defendant from being unfairly prejudiced.

11

We note with approval that a number of other jurisdictions recognize immunity agreements as contractual in nature and enforceable under the principles of contracts. United States v. Fitch, 964 F.2d 571 (6th Cir. 1992) ("To secure a defendant's cooperation in a criminal investigation, the government may informally grant him immunity in exchange for his testimony. An agreement not to prosecute is contractual in nature, and subject to contract law standards.") (citations omitted); see also United States v. Pelletier, 898 F.2d 297 (2d Cir. 1990); United States v. Packwood, 848 F.2d 1009 (9th Cir. 1988); United States v. Brown, 801 F.2d 352 (8th Cir. 1986); United States v. Reardon, 787 F.2d 512 (10th Cir. 1986); United States v. Irvine, 756 F.2d 708 (9th Cir. 1985); Closson v. State, 812 P.2d 966 (Alaska 1991); State v. Myrhow, 865 P.2d 231 (Mont. 1993); 22 C.J.S. Criminal Law § 85 (1989) ("Grants of immunity pursuant to statute are not the only method of acquiring immunity, but courts also recognize informal agreements whereby promises of immunity are made in exchange for cooperation. . . . A cooperation-immunity agreement is in the nature of a contract and subject to contract law standards").

The State argues that Bruno should not be overruled because "the content of verbal agreements 'will provide a prolific source of litigation.'" We observe that this predicted problem, if it ever materializes, is easily solved by reducing such agreements to writing. Additionally, we are not persuaded that this is a

12

sufficient reason[9] to allow the State to break its bond of public

trust, a subject upon which the Indiana Supreme Court has so

eloquently articulated:

> We recognize that the public may benefit substantially from a prosecutor's decision to withhold prosecution of one individual in exchange for information leading to the arrest and conviction of a person deemed more dangerous to the public welfare. The availability and usefulness of this strategy could be substantially neutralized if the prosecutor's promise is perceived to be unreliable. Substantial harm could result from a decision which removes this weapon from the prosecutor's arsenal.
>
> **Furthermore, the promise of a state official in his public capacity is a pledge of the public faith and is not to be lightly disregarded. The public justifiably expects the State, above all others, to keep its bond. . . . "It is important for all segments of our society to believe that our court systems dispense justice. This includes the criminals themselves as well as the law abiding citizens, and especially those criminals who have cooperated fully in police investigations."**

Bowers v. State, 500 N.E.2d 203, 204 (Ind. 1986)(*quoting* Dube v.

State, 275 N.E.2d 7, 11 (Ind. 1971))(citations omitted) (emphasis

added). We embrace these principles.

---

[9]While the State asserted in its brief that "[t]here are numerous dangers in allowing courts to engage in the enforcement of immunity agreements," it did not enumerate any additional "dangers" to the threat of "prolific. . .litigation."

For the above reasons, we hold that an agreement between a prosecutor and a defendant is contractual in nature and is enforceable under the law of contracts. Accordingly, Bruno v. State, 240 S.W.2d 528 (Tenn. 1951), and its progeny are overruled.[10]

III

We now consider whether Howington met his obligation under the agreement. For the State to prevail on this issue, it must prove that Howington failed to deliver on his part of the deal. But what are the evidentiary burdens in this regard?

This issue has been considered by the Texas courts. In its analysis of the defense of immunity the Texas Court of Criminal Appeals stated:

> [W]e do not agree . . . that immunity is a defense under the Code of Criminal Procedure. We do agree that it is analogous to one. The initial burden is on the defendant to show the existence of the evidence. Turney v. State, 51 S.W. 243 (Tex. Crim. App. 1899). In this respect it differs from ordinary defenses where the defendant is only required to raise his defense by producing some evidence. However, once the initial burden is met and the existence of an

---

[10]As to the specific issue addressed in Bruno--whether agreements entered into by a police officer and a defendant are enforceable--we reserve decision until the question is again squarely presented.

14

immunity agreement is shown by a preponderance of the evidence, we hold that; procedurally, immunity should be treated just like a defense under the Code. Thus, the burden then shifts to the State to show beyond a reasonable doubt why the agreement is invalid or why prosecution should be allowed despite the agreement.

Zani v. State, 701 S.W.2d 249, 254 (Tex. Crim. App. 1985). In the Zani case, the prosecution argued that the defendant was not entitled to enforce the immunity agreement because she violated the term of the agreement which provided that "she did not directly cause the death of" the victim. Id. at 251. In arriving at its holding, the court observed that

[t]o place upon the State any lesser burden creates a rather anomalous situation. For example, in the instant case, if the State was only held to a preponderance standard to prove the violation of the immunity agreement, it is quite possible that the State could produce sufficient evidence to void the agreement and thus prosecute, but insufficient to obtain a conviction. The State could prove by a preponderance of the evidence that appellant "directly" caused the death of Dess, but could not prove this beyond a reasonable doubt. However, they could easily prove she was a party to the offense. In such a case the State could invalidate the immunity agreement at the pre-trial hearing making it void and non-binding and then obtain a conviction for being a party to murder, an offense for which immunity was originally granted.

15

<u>Id.</u> at 254 n.3.

We agree with the reasoning of the Texas court and adopt the burden of proof standard set forth in its opinion. Thus, in order for the State to prevail in this case, it must prove beyond a reasonable doubt that Howington failed to deliver on his part of the deal. The State contends first that it is excused from performance because Howington failed to satisfy a condition precedent to its performance; that is, he failed to testify truthfully. <u>See</u> Restatement (Second) of Contracts § 225 (1981) ("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.").

We begin with the agreement itself. The basic agreement appears to be that the State agreed to recommend to the magistrate that Howington's case be bound over to the grand jury on second-degree murder and that his bond be reduced to $50,000, all in return for Howington's truthful testimony. The State insists that its duty to perform was conditioned upon Howington's truthful testimony. Howington and his attorney insist that no language of condition was used when the agreement was made. They support this insistence by pointing out that were the agreement conditional, they would not have so readily agreed, as it required Howington to waive his right against self-incrimination.

The following principles guide our decision:  First, in contract law there is a general preference against finding a term to be a condition precedent.  Specifically, the Restatement says,

> In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk.

Restatement (Second) of Contracts § 227.  In this case, the circumstances[11] do not indicate that Howington assumed the risk.  Also, while the State contends that the condition was Howington's truthful testimony, which Howington controlled, we find that the actual condition it urges is its own subjective assessment of Howington's testimony.  This condition is not controlled by Howington.  Thus, we find there was no condition precedent in the agreement between the State and Howington.[12]  Or rather, the condition was simply that Howington testify against DeVito, which he did.

---

[11]We do not find it convincing that Howington would have so readily waived his right against self-incrimination while facing a first-degree murder charge if he had not believed that the State was bound under the agreement from the outset.

[12]By analogy, we observe that in a plea-agreement situation, the only condition precedent is the court's acceptance of the agreement. Once that takes place, the State's performance is due.

17

Second, this agreement is different from the average commercial contract as it involves a criminal prosecution where due process rights must be fiercely protected. Thus, we hold that ambiguities in the agreement must be construed against the State. See United States v. Pelletier, 898 F.2d 297, 302 (2d Cir. 1990). It results that the State must be held to a high evidentiary standard as it attempts to avoid an agreement made with an accused where the accused has already acted in reliance on the agreement. We find that the State has not carried its burden to show that the agreement was understood by all parties to be conditional upon the State's subjective determination that the defendant's testimony was "truthful."

Next the State argues that it is relieved from its duty to perform because Howington committed a material breach. The conditions which will constitute a breach of the immunity agreement are governed by the agreement. United States v. Fitch, 964 F.2d 571, 574 (6th Cir. 1992) (*citing* United States v. Packwood, 848 F.2d 1009, 1012 (9th Cir. 1988)).

Under the agreement, Howington's failure to testify truthfully could constitute a breach. In this instance, the State maintains that Howington lied regarding the amount of money he received from the robbery.

Despite the State's contention, the record suggests that Howington kept the bargain. The critical exchange follows:

> Q (by State): Let me ask what else took place between you and him at his house immediately prior to the phone call to Kathy?
>
> A: Well, before we called her, I took my coat off. He [DeVito] said, "Take your coat off because there is blood on it here." He said, "Let's burn it", [sic] you know, he took his boots off and burned it. **He took Mike's wallet out and just started burning everything.**
>
> **Q: Were you ever <u>given</u> any of the money?**
>
> **A: Yes, I was. He <u>gave</u> me five hundred dollars to keep my mouth shut.**

Pressing further, the State urges that the testimony of Kathy Dalton to the effect that when Howington arrived at her house he had $4,500 in blood-splattered money. However, closer examination of Dalton's testimony reveals that she never attempted to suggest how the defendant had come into possession of more than the $500 received from DeVito. So, if we are correct that Howington, unbeknownst to DeVito, grabbed a sum of money at the scene of the crime, then the above-quoted response to the question (also above-quoted) could very well be true, even if not complete. While this may be a fine distinction, it is a valid one because the State should not expect an accused to make a more complete response than necessary to answer the question truthfully.

19

In light of the above, it remains questionable whether Howington lied after all. However, we need not make a specific finding in this regard because of our conclusion that any untruthfulness in his testimony was immaterial. In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241. Additionally, we find that in the area of informal immunity agreements where a criminal defendant is necessarily involved, "the most important consideration is the incriminating nature of the proferred [sic] statements, not the amount of information provided to the government." Fitch, 964

20

F.2d at 574 (*citing* <u>United States v. Johnson</u>, 861 F.2d 510, 513 n.3 (8th Cir. 1988)).

In this case, the State enjoyed the benefit which it reasonably expected; that is, eyewitness testimony against DeVito. Also, while the agreement provided no remedy for a breach,[13] revoking the agreement certainly does nothing to compensate the State for any alleged injury, and it is decidedly unfair to do this after Howington relied on the agreement. Moreover, Howington produced exceptionally incriminating evidence, not only against DeVito, but also against himself. Finally, in light of Howington's complete cooperation, his answer regarding the amount of money he was given hardly indicates a lack of good faith and fair dealing on his part. Thus, we conclude that any breach which occurred under the facts was not material considering the circumstances.

IV

For all these reasons, we hold that the State was obligated to perform under the agreement it entered into with Howington. It remains to decide what the result of the State's refusal should be. First, it would be useless to go back to the preliminary hearing because the State agreed only to <u>recommend</u> to

---

[13]A charge of perjury may be a consideration under these circumstances.

21

the magistrate that Howington be bound over on second-degree murder. The magistrate would have had no obligation to accept the recommendation. Moreover, even if the magistrate were to have accepted the recommendation and bound Howington to the grand jury on the lesser charge, the grand jury was free to indict upon whatever charge it found applicable. Nevertheless, Howington was deprived of the chance that the grand jury might have accepted the magistrate's recommendation (if made) and indicted upon the lesser charge. Howington gave up a lot for that chance; he received nothing in return. Fundamental principles of justice and fair play would require that the parties to the unconsummated bargain be restored to their former positions. Obviously, this is not a possibility. Failing that, the only just remedy would be to position the defendant as though all variables had worked to his advantage. "The Supreme Court . . . shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires and may grant any relief, including the giving of any judgment and making of any order. . . ." Tenn. R. App. P. 36(a)(1995).

Accordingly, we reverse the conviction for first-degree murder and enter judgment convicting the defendant of second-degree murder. We vacate the sentence and remand the cause for resentencing on second-degree murder.

22

_____
ADOLPHO A. BIRCH, JR., Justice

CONCUR:

Anderson, C.J.
Drowota, Reid, White, JJ.