# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 25, 2001 Session

## STATE OF TENNESSEE v. JOHN A. BOATFIELD

**Direct Appeal from the Criminal Court for Hamilton County**
**Nos. 222129 and 222131  Rebecca J. Stern, Judge**

---

**No. E2000-01500-CCA-R3-CD**
**December 20, 2001**

---

The defendant appeals his premeditated first degree murder and abuse of a corpse convictions for which he received concurrent sentences of life imprisonment and two years, respectively, arguing: (1) the trial court erred in not enforcing a plea agreement; (2) the evidence was not sufficient to support his convictions; (3) hearsay evidence of the victim's statements was erroneously admitted; (4) evidence obtained via wiretaps was erroneously admitted; (5) evidence regarding defendant's alleged romantic relationship with a woman other than his wife was erroneously admitted; and (6) the trial court should have charged the jury regarding alibi. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. JOSEPH M. TIPTON, J., filed a concurring opinion.

Jerry H. Summers, Chattanooga, Tennessee, for the appellant, John A. Boatfield.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; William H. Cox, III, District Attorney General; and David Wayne Denny and Lila Statom, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On March 12, 1998, firemen responded to a fire at the home of the defendant and discovered the defendant's wife, Emily Denise "Nicy" Boatfield, dead in her bed with bedclothes piled over her. A fire had been set beneath the bed using gasoline. Kitchen matches, a .22 caliber shell casing, and the defendant's .22 caliber rifle were in the charred debris. The rifle was cocked with a round in the firing chamber. Arson investigator Alec Conner opined that the fire was typical of a fire set to conceal a crime. The fire was confined to the master bedroom.

The victim was shot in the head and stabbed twice in the abdomen. Her right leg and foot were burned and charred black. Dr. Frank King, Hamilton County medical examiner, testified the victim was first shot and then stabbed. According to Dr. King, the gunshot killed her within seconds; she was then stabbed as she died or soon thereafter; and she died before the fire started. He said the victim's right hand was not injured, nor did she have any defensive wounds. He estimated she died between 8:00 a.m. and 10:00 a.m.

Dr. King opined she was probably shot in bed, and it was highly improbable she was shot elsewhere and moved to the bed. Thick blood and tissue were around the pillow on the bed. He testified blood found elsewhere in the master bedroom and hall was disbursed from the bed after the victim's death, probably by the firemen. No foreign genetic material was found underneath the victim's fingernails. Forensic tests revealed the shell casing found was fired from the defendant's rifle. Dr. King stated the victim's stab wounds were consistent with the use of a single-edge knife blade.

The home showed signs of an apparent burglary. In the living room, the gun cabinet was opened by force, and a container of .22 caliber bullets, bearing the defendant's fingerprints, was spilled on the floor. A tire tool was found in the floor. Tommy McMillin, the defendant's son-in-law, identified the tire tool as one he had been using to repair a car in the Boatfields' backyard the day before the murder. McMillan said he left the tool in the backyard by an outbuilding.

Both the master bedroom and the bedroom belonging to the Boatfields' teenage daughter were ransacked. Jewelry boxes were open and their contents strewn. The back door, which had an ADT Security sticker on the window, appeared to have been forced open using the tire tool.

When officers arrived at the crime scene, they found televisions and a stereo in the home. Three guns were in the gun cabinet. The victim's jewelry, including diamond rings, a watch, necklace and earrings, were still on her body. A purse, pager, cellular telephone and keys were on the kitchen table. The defendant told insurance investigator Danny Walker that jewelry, silver bars, money and old coins were taken. He told Walker and the police that no guns were missing. He also told the police he had loaded the .22 caliber rifle to shoot at dogs, and it possibly had five rounds in it.

Officer Rick Phillips, who lived in the neighborhood, testified it was a safe neighborhood and 20 to 30 officers resided within four miles of the Boatfield home. The neighborhood is a high traffic area with homes adjacent to the Boatfield home located only 75 to 100 feet away. One belonged to Dee Newell, who kept three dogs in a fence close to the Boatfields' driveway. Officer Phillips and Inspector Michael Mathis testified that Newell's dogs barked most of the time they were present at the crime scene. Newell testified one of her dogs barked at strangers, but on the morning of the murder, she did not hear the dogs bark until the fire trucks arrived.

There was a sign in the front yard of the Boatfield home indicating it was monitored by ADT Security. The house and all of the yard are visible from the road. Two of the Boatfields' vehicles, the defendant's red truck and a Saturn, were parked in the driveway. The Boatfields' dog, a

Chihuahua named Chico, would bark when someone entered the home and was protective of the victim. The defendant told insurance investigator Walker, his father-in-law Ray Smith, and the police that Chico was in the house. After the murder, Chico was found unharmed outside the house.

On the morning of the murder, the defendant and Candace Boatfield, the teenage daughter of the defendant and the victim, left home in the victim's new purple truck just before 7:00 a.m. They made a brief stop at the defendant's business, Nursery Brokers, and arrived at a restaurant for breakfast by 7:00 a.m. The defendant told Detective Charles Dudley that his wife was asleep when they left. Candace Boatfield testified they remained at the restaurant for an hour or less. Then the defendant took her to school, where they arrived at approximately 8:05 or 8:10 a.m. During the drive to school, the defendant told his daughter he was going to wash the truck, pick up parts for his dune buggy and go to work.

The defendant told Detective Dudley he returned home, where his wife was awake and watching television. He said she asked him to spend the day with her, but he declined because he had work to do. The defendant said he told her he would wash her truck. He also called his brother at Nursery Brokers.

According to telephone company records, a one minute phone call was placed from the Boatfield residence to Nursery Brokers at 8:57 a.m. Tommy McMillin testified the defendant called Nursery Brokers between 9:00 and 9:05 a.m. and then arrived at the business 15 to 20 minutes later. The defendant told Detective Dudley he left home some time after 9:00 a.m. In a recorded interview with insurance investigator Walker, the defendant said his wife was watching television when he left the house at 9:15. After the defendant arrived at Nursery Brokers, he left in the purple truck, stating he was going to wash the truck and pick up parts.

ADT Security Services received a fire alarm call from the Boatfield residence at 9:22 a.m. At 9:27 a.m., ADT called the defendant's business and a man stated the defendant was not there. McMillin testified he answered the telephone when ADT called and told them the defendant would return in 30 minutes.

The defendant told Detective Dudley he arrived at the carwash approximately 15 minutes after he left Nursery Brokers. Betty Grant and Virgil Garner, East Ridge Carwash employees, recalled the defendant arriving at the carwash at approximately 10:00 a.m. driving a purple truck. The defendant told Detective Dudley he was at the carwash for about five to ten minutes. According to the defendant's statement to Detective Dudley, he put gas in the truck and went to Capital Toyota where he stayed about 20 minutes.

He said he then went to Advance Auto Parts, where he spent about 30 minutes. Stephen Johns and Robert Massengale, employees of Advanced Auto Parts, recalled the defendant coming into the store that morning to pick up dune buggy parts. Johns said he offered to sell the defendant some old Volkswagen parts at a reduced price, and, after a ten to fifteen-minute discussion, the defendant purchased them as well. He did not recall the defendant's request to use the telephone. Massengale recalled giving the defendant permission to use the telephone. The defendant told Inspector Michael

Mathis he tried to call home and Nursery Brokers, but got no answer. Telephone records show no phone calls were placed from Advance Auto to the Boatfield residence or Nursery Brokers. The defendant completed his purchases at Advanced Auto at 10:55.

The defendant told insurance investigator Walker he proceeded to the car dealership after he left Advanced Auto and then went to the home of Alvin Walker, Jr., who was repairing the defendant's dune buggy. According to stipulated statements by Alvin Walker, Jr. and his father, Alvin Walker, Sr., Walker, Sr. answered the door and told the defendant there had been a fire at his house. The defendant replied that Walker, Sr. should not joke about things like that. When Walker, Sr. told the defendant his wife was found inside the house, the defendant fell to the ground screaming and crying. Walker, Jr. drove the defendant to his home, where the defendant refused to get out of the vehicle and asked Walker, Jr. to take him to his mother's home.

In the defendant's statement to Detective Dudley, he stated Walker, Sr. said he was sorry to hear about his wife. The defendant said he asked Walker, Sr. what he was talking about and Walker, Sr. told him his house had caught fire and his wife had died.

Martha McNabb, the victim's mother, testified that in January or February 1998, the victim called her after awaking to a suspicious fire in her bedroom, which apparently was started by a lit candle. She said the victim suspected the defendant or their daughter, Candace Boatfield, set the fire.

Inspector Mathis testified he interviewed the defendant in a car outside the defendant's residence at approximately 11:45 a.m. on the day of the murder. Mathis said the defendant held his head down and moaned with his hands covering his face. He observed others helping the defendant walk and get in and out of the vehicle as if he could not stand on his own. Mathis stated the defendant was aware his wife was dead. Mathis explained to him the police were investigating her death. Though the defendant's hands were covering his face, his eyes were darting to look at Mathis and to look out the window of the car. Mathis also noticed that although the defendant was making crying sounds, he was not shedding any tears. The defendant made comments indicating his wife was dead, such as, "She was my best friend." After Mathis ended the interview and as the defendant's sister helped the defendant out of the car, the sister told the defendant, "She's dead." The defendant responded, "I didn't know she was gone." Mathis testified he found it unusual the defendant never asked him what had happened to his wife, how she had died, or where she was.

Melody Jones, the victim's sister, testified that when the family gathered following the murder, she observed the defendant sitting down, leaning with his hands over his face, but looking at the victim's family through his fingers. She said while the defendant wailed and made noises, she did not see any tears. Jones said the defendant made inconsistent statements about his and his wife's activities on the day of the murder. She testified he initially said the victim was asleep when he left the house, but later said she was watching television and it was playing so loudly he told her to turn it down because she would not hear if anyone entered the house. The defendant told Jones he took Candace to school in his red truck. He said he later returned home, and without going in, picked up the purple truck in order to clean it. Jones also testified she did not know of any injury to the victim's hand.

The victim's father, Ray Smith, said he asked the defendant if he killed his daughter. The defendant replied that he "never laid a hand on her." Smith said the defendant became extremely nervous, began shaking, and left.

On March 13, 1998, Detective Dudley and other officers made a videotape as they walked through the house with the defendant and interviewed him. Detective Dudley testified that to his knowledge, the defendant was not told about the stab wounds to the victim's abdomen at the time the tape was made. As the officers and defendant reviewed the contents of the gun cabinet, the defendant pointed out that a knife was missing. The defendant drew a picture of the knife, showing that it had a single-edge blade.

Insurance agency employee, Gina Hembree, testified the defendant came by her office on March 18, 1998, before the agency received the fire report. When Hembree inquired as to how the fire began, the defendant told her he thought urethane on a jewelry box was ignited by a lighter or a candle. He also stated he had only been gone fifteen minutes when the fire began. On March 27, 1998, the defendant visited Hembree's office again and told Hembree police had located a witness, who was "dern [sic] near beat to death and in a coma." As the defendant made this statement, he looked Hembree "dead in the eye," giving her pause because he had also asked her if the police had spoken with her. There is nothing in the record to indicate the police ever located a witness who had been beaten.

On March 20, 1998, insurance investigator Walker interviewed the defendant. Walker questioned the defendant regarding whether he kept flammable liquids such as gasoline, kerosene, charcoal lighter fluid, or paint thinner. The defendant replied he did not. On July 1, 1998, Walker was present when the defendant stated he kept paint thinner under the sink and an empty can of Coleman fuel in an outbuilding. The defendant told Inspector Michael Mathis that there might have been charcoal lighter fluid under the kitchen sink, and matches were kept in the kitchen drawer.

When Detective Dudley questioned the defendant regarding his financial condition, he said he was financially stable and owed nothing on his home. In May 1993, the defendant was injured while working at a foundry and lost his job. Ray Smith, the victim's father, testified he assisted the defendant in establishing the business, Nursery Brokers, so the defendant could support his family. Smith stated the business "took off" and did better than he expected. When Smith turned the business over to the defendant in January 1997, the business owed little debt. Smith described the defendant as a poor businessman. Smith testified that in November 1997, the business's checks to a supplier and for rent were returned for insufficient funds. Other proof established the defendant had difficulty paying for telephone services and insurance.

In 1997, the Boatfields obtained an equity line of credit in the amount of $44,000 secured by their home. Wayne Upchurch, the bank's branch manager, testified that "Nicy" Boatfield was very reluctant to enter into the loan agreement and wanted safeguards to ensure no funds could be withdrawn without both signatures. Mr. and Mrs. Boatfield signed a written agreement requiring both of them to sign before funds could be withdrawn on the line of credit. The Boatfields purchased

credit life insurance to pay the loan in the event either of them died. As of March 12, 1998, the balance due on the line of credit was approximately $50,000. On March 20, 1998, the defendant asked to file a claim on the credit life insurance. The defendant's claim was denied because the premium payments were delinquent at the time of the victim's death, which displeased the defendant. Later, the bank began foreclosure on the house. In addition to the credit life insurance, the defendant had insurance coverage on the house and its contents. The defendant told Walker during the March 20, 1998, interview his house payments were current, and he had just learned that they had credit life insurance to pay the outstanding balance.

Shortly before the murder, the Boatfields purchased a purple truck from Capital Toyota. Edward Virgil Emerson, a finance manager at the dealership, testified he assisted them with the financing. Emerson stated the victim was vehement about having the vehicle solely in her name because she would be making the payments and was upset when she learned that the only way financing could be obtained was to include the defendant. Emerson offered them credit life and disability insurance. The defendant asked if such insurance would pay for the vehicle if something happened to either of them. Emerson advised that coverage for both of them would be more expensive. The victim did not want to pay the extra expense for joint coverage, but the defendant agreed to pay for the additional expense. The insurance would have paid the debt on the vehicle upon the victim's death.

The victim was employed by the Dialysis Clinic, Inc. David Hagwood, director of human resources for the Dialysis Clinic, testified the defendant would have been entitled to benefits totaling $87,700. On June 10, 1998, the defendant applied only for her retirement benefits, which were approximately $15,700.

The Boatfield family members were close friends with Lonnie and Brenda Tripp and their children. They attended the same church and had vacationed together. Brenda Tripp also worked at the Dialysis Clinic. The Tripps' sons had worked at the defendant's business. In 1997, the Tripps began having marital problems, and at the time of the murder, they were divorcing. In August 1997, the defendant and Brenda Tripp traveled to Alabama to assist the Tripps' oldest son, whose car was disabled. In the months preceding the victim's death, numerous calls were made from the defendant's cellular telephone to Brenda Tripp's pager, home, place of employment, and cellular telephone. Likewise, numerous calls were made from Brenda Tripp's cellular telephone to Nursery Brokers, the defendant's cellular telephone, his pager and his home. The phone calls continued after the victim's death. The defendant repeatedly told Inspector Michael Mathis he did not know Brenda Tripp's cellular telephone and pager numbers. Hours after Inspector Mathis interviewed Brenda Tripp on March 27, calls were placed between the defendant and Brenda Tripp.

The defendant was openly involved in a romantic relationship with Brenda Tripp after the victim's death. Inspector Michael Mathis testified that in June 1998, police intercepted telephone calls between the defendant and Brenda Tripp in which it was apparent they were physically intimate. The state presented a tape recording of a conversation between the defendant and Tripp from June 19, 1998, indicating the two were having sexual relations. In February 1999, the defendant sent a letter to Lonnie Tripp claiming he was not involved with Brenda Tripp before the

Tripps' separation, but apologized to Tripp for betraying his friendship. In the letter, the defendant also stated he had prayed for God and the victim to forgive him.

Melody Jones, the victim's sister, testified the Boatfields had marital problems for years. Jones stated the victim suspected the defendant was having an affair with Brenda Tripp.

The defense presented the testimony of Candace Boatfield and Eddie Boatfield, the defendant's brother, who testified the victim's hand appeared swollen after her death. Eddie Boatfield testified the defendant screamed and cried hysterically after his wife's death. Officers also testified the defendant cooperated in the investigation by giving fingerprints, blood samples, interviews, and was willing to take a polygraph. Terry D. Traylor testified the defendant was not able to do lifting. The defense submitted medical records showing the defendant had undergone four surgeries on his cervical spine since his injury at work in 1993.

Tommy McMillin testified during cross-examination that when he saw the defendant at Nursery Brokers on the morning of the murder, there was no blood on the defendant's jacket; the defendant did not smell like gasoline; he did not appear to have been in a struggle; and he was behaving normally. The defendant's brothers testified for the defense that they found footprints approximately 100 feet behind the house at the back of the yard near the woods.

Candace Boatfield testified her mother knew the defendant went with Brenda Tripp to Alabama to assist Durand Tripp and was not upset. Candace Boatfield and Sharon Beaver testified Brenda Tripp and the victim slept in the same bed during a church trip to Gatlinburg two weeks before the murder. Witnesses testified the defendant's cellular telephone was used by many people, including Brenda Tripp's sons, who worked at Nursery Brokers.

Sabrina McMillin, the defendant's daughter from a prior marriage, testified for the defense that she listened to the tapes of the phone calls intercepted by the police from her father's and Brenda Tripp's phones and prepared a summary showing most of the phone calls were not between the defendant and Tripp. McMillin said she was never aware of any romantic relationship between Brenda Tripp and her father prior to the victim's death. Lonnie Tripp testified he did not accuse the defendant of being involved with his wife prior to the victim's death.

Candace Boatfield testified her parents continued to live together after the incident in which her mother found a candle burning by her bed, and her parents did not have any major arguments. She stated her mother joked about the candle incident. Officer Charles Russell testified he took a statement from the victim's mother, Martha McNabb, who said the victim did not name either the defendant or Candace Boatfield as a suspect who lit the candle in her bedroom.

John Hilhoit, administrator of the Dialysis Clinic, testified the victim earned over $28,000 in 1997 and over $26,000 in 1996. He confirmed the victim was being considered for a promotion at the time of her death.

Based on this evidence, the jury found the defendant guilty of premeditated first degree murder and abuse of a corpse.

# I. PLEA AGREEMENT

The defendant maintains he was entitled to specific performance of a plea offer made to him by the state prior to trial. He argues the trial court erred in rejecting the agreement and in failing to order specific performance of the agreement. He further submits that the district attorney general illegally granted authority to the victim's family to revoke the plea agreement and, in doing so, violated his constitutional rights. We disagree.

## A. Factual Background

On April 17, 2000, an assistant district attorney and defense counsel discussed a potential plea agreement in which the defendant would plead guilty to voluntary manslaughter for a five-year sentence with appropriate credit for almost two years for time served. The assistant district attorney reviewed the agreement with members of the victim's family, and they were satisfied with it. The following day, both counsel approached the trial judge to advise her of the potential agreement. The trial judge indicated her "acceptance of it upon the victim's family members being satisfied with it." Defense counsel was interested in finding a means by which the defendant could avoid being sent to the Department of Correction for classification and instead be eligible for prompt release. At the suggestion of the judge, the attorneys conferred with the coordinator for the felony community corrections program regarding the defendant's eligibility for alternative sentencing under that program and awaited his response.

Defense counsel reviewed the proposed agreement with the defendant, who found it acceptable. Defense counsel advised the state of the defendant's acceptance and a plea hearing was scheduled for the next day. Later, the assistant district attorney learned of the victim's family's objection to the plea agreement, apparently since they "had never been informed about Community Corrections as an option to [penitentiary] classification." When defense counsel arrived for the hearing, the assistant district attorney advised him he was withdrawing the offer due to the family's objection. The defendant moved the trial court to specifically enforce the plea agreement, and the trial court denied the motion.

## B. Plea Agreements

The making of a plea offer is a matter which lies entirely within the prosecutor's discretion. State v. Head, 971 S.W.2d 49, 51 (Tenn. Crim. App. 1997). The state is under no obligation to offer any benefit to the accused in exchange for his plea of guilt. Harris v. State, 875 S.W.2d 662, 666 (Tenn. 1994). If the state elects to extend a plea offer, it is revocable until it is accepted by the trial court. *Id.* While a defendant may seek to have a plea agreement specifically enforced, this relief is available only when the trial court has accepted the plea and the agreement. *Id.*

Further, there is no absolute right to have a plea agreement accepted by the trial court. State v. Burris, 40 S.W.3d 520, 523 (Tenn. Crim. App. 2000) (citing Santobello v. New York, 404 U.S. 257, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971)). The trial court may, in the exercise of its discretion, either accept or reject a plea agreement. Parham v. State, 885 S.W.2d 375, 382 (Tenn. Crim. App. 1994). The plea agreement is not enforceable by either party until it is accepted by the trial court. *Id*.

## C. Analysis

In the case *sub judice,* it is clear that while the trial court was tentatively satisfied with the plea agreement, it had not yet been "accepted" by the trial court. There was never a hearing in open court during which the defendant entered a formal plea of guilty pursuant to the proposed plea agreement. Therefore, the state remained at liberty to withdraw the offer it had previously made, despite the defendant's expressions of willingness to enter a guilty plea pursuant to the plea offer. The state's revocation based on the family's objection to the proposed plea agreement was within its discretion. Regardless, it was within the trial court's discretion to reject the proposed plea, which it indicated it would do absent the agreement of the victim's family.

The defendant argues State v. Howington, 907 S.W.2d 403 (Tenn. 1995), and State v. Spradlin, 12 S.W.3d 432 (Tenn. 2000), control this court's decision in the instant case. However, both Howington and Spradlin involved situations where the defendants were promised a form of immunity in exchange for their cooperation with law enforcement, but the agreements were not formalized by the trial courts. The Howington court recognized the enforceability of plea agreements, but clearly stated plea agreements were only enforceable once the condition precedent of the trial court's acceptance of the agreement is met. 907 S.W.2d at 407. In Spradlin, law enforcement officers promised the defendant that if he would work as a confidential informant, he would avoid prosecution on uncharged offenses. 12 S.W.3d at 434. The supreme court ruled the agreement between Spradlin and the officers was not enforceable because it was not authorized by the district attorney. *Id*. at 437-38.

In the instant case, the defendant and the state had an informal plea agreement rather than a contract for immunity conditioned upon the defendant's cooperation in the prosecution of another party. There is no evidence that the defendant gave up any of his rights in consideration of the offer made by the state. Therefore, the holdings of Howington and Spradlin are inapplicable.

Further, the trial judge did not abuse her discretion in failing to accept a plea agreement that had been permissibly revoked by the state. For these reasons, this issue is without merit.

## II. SUFFICIENCY OF THE EVIDENCE

## A. Standard of Review

The defendant argues the circumstantial evidence presented by the state was insufficient to support his conviction for first degree murder. Although the evidence of defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). However, for this to occur, the circumstantial evidence must be consistent with guilt of the accused, inconsistent with innocence, and must exclude every other reasonable theory or hypothesis except that of guilt. Tharpe, 726 S.W.2d at 900.

Great weight is given to the jury verdict in a criminal trial; it accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Therefore, while following the above guidelines, this court must remember that the jury decides the weight to be given to circumstantial evidence. "The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions . . . for the jury." Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (citation omitted); *see also* State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).

Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

## B. Statutory Requirements

The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The element of premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of the intent to kill the victim by the defendant, the making of preparations before the

killing for the purpose of concealing the crime, and calmness immediately after the killing. *See* Bland, 958 S.W.2d at 660.

A person commits the offense of abuse of a corpse by physically mistreating a corpse in a manner offensive to the sensibilities of an ordinary person. Tenn. Code Ann. § 39-17-312(a)(1).

## C. Analysis

In this case, the state presented proof the victim was shot in the head and then stabbed twice while she was unarmed in her bed. A fire was then set in an apparent effort to conceal the crime. The facts are sufficient to support the jury's finding that the murder was premeditated. The proof also established the defendant was present in the home minutes before an alarm notified the security service of the fire; the defendant's weapon was used to kill the victim; and his fingerprints were found on the canister of ammunition. The defendant made numerous inconsistent and false statements subsequent to the murder. Though the Boatfield home appeared to be the site of a burglary, weapons and other valuables in plain view remained in the home. Viewing the evidence in a light most favorable to the state, the state also established the defendant had financial and romantic motives to kill the victim. The proof was sufficient to support the jury's finding that the defendant premeditatedly and intentionally perpetrated his wife's murder.

We further conclude the evidence was sufficient to establish that the defendant, by burning the victim's body, physically mistreated the corpse in a manner offensive to the sensibilities of an ordinary person. Thus, the evidence was sufficient to establish abuse of a corpse.

## III. VICTIM'S HEARSAY STATEMENTS

In early 1998, a few weeks prior to her death, the victim called her mother, Martha McNabb, and in a frantic voice said, "I should be dead right now." The victim explained she awoke that morning to find a fire in her bedroom, with a candle burning next to her pillow and the waste basket beside her bed melted to the floor. She also stated, "Someone is trying to kill me." McNabb testified the victim said she suspected the defendant or Candace Boatfield was trying to kill her. McNabb described the victim as "scared to death" and indicated her daughter screamed.

Prior to trial, the defendant objected to the admissibility of the victim's statements to her mother, arguing they were inadmissible under Tenn. R. Evid. 401, 402 and 403. The trial court ruled that the statements were admissible as an excited utterance under Tenn. R. Evid. 803(2). The defendant also argues that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. We confine our analysis to Tenn. R. Evid. 401, 402, 403 and 803(2).

A declarant's out-of-court statement used in court to prove the truth of the matter asserted in the statement is hearsay. Tenn. R. Evid. 801(c). One of the exceptions to the hearsay rule is an excited utterance, "[a] statement relating to a startling event or condition made while the declarant

was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). Three requirements must be met before a statement will qualify as an excited utterance: first, there must be a startling event or condition; second, the statement must relate to the startling event or condition; and third, the declarant must still be under the stress of excitement from the event or condition when the statement is made. State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997); State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993).

Applying this analysis to the victim's statements to her mother, we conclude awakening to a fire would be startling and the statements relate to the fire the victim found near her bed. Further, the victim's statements were made while she was under the stress of excitement caused by the event. The witness testified the victim screamed and was "scared to death." Therefore, we hold these statements qualified as an excited utterance under Tenn. R. Evid. 803(2).

The defendant also argues this evidence was not relevant, and the probative value of the victim's statements was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 401, 402 and 403. The victim's statements to her mother are relevant to the issues of the identity of the perpetrator and premeditation. The statements establish that weeks prior to the murder, someone within the victim's home attempted to set a fire near the victim's bed. The only persons living in the home were the victim, the defendant and the couple's teenage daughter. At trial, neither the state nor the defendant implicated the daughter, and the facts establish she was at school at the time her mother was killed. The previous fire in the bedroom, set in a similar fashion to the fire on March 12, 1998, was probative of the identity of the murderer as the defendant argued the victim was killed by a burglar. Furthermore, this evidence was probative of premeditation. A prior attempt to burn the victim is indicative of the premeditated nature of the second effort.

The relevance of evidence under Rule 402 and the determination under Rule 403 of whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice are left to the sound discretion of the trial court. State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). The trial court's determination will not be reversed on appeal absent a showing of abuse of discretion. State v. Bigbee, 885 S.W.2d 797, 806 (Tenn. 1994). We are unable to conclude the trial court strayed from its discretionary authority in its ruling. This issue is without merit.

## IV. WIRETAPS

The defendant argues the state failed to comply with the Wiretapping and Electronic Surveillance Act of 1994, Tenn. Code Ann. §§ 40-6-301 *et seq.*, and that evidence obtained by law enforcement through electronic interception of the defendant's telephone calls should have been suppressed. We disagree.

### A. Statutory Requirements

The act allows certain judges to issue orders authorizing interception of wire, oral, or electronic communication upon the application of law enforcement. Tenn. Code Ann. § 40-6-304. The application must include the identity of the applicant officer and the district attorney general authorizing the application, a full and complete statement of the facts relied upon by the applicant, details of the offense, a description of the facilities from which the communication is to be intercepted, a description of the type of communication sought to be intercepted, the identity of all known persons committing the offense and whose communications may be intercepted, a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous, a statement of the time period for which the interception is required to be maintained, and a statement of facts concerning previous applications. Tenn. Code Ann. § 40-6-304(a).

A judge may issue an *ex parte* order authorizing the interception upon finding (1) probable cause that the individual committed the offense; (2) probable cause that communications regarding the offense will be obtained; (3) normal investigative procedures have been or will be unsuccessful or are too dangerous; and (4) probable cause that the facilities are or will be used in connection with the commission of the offense. Tenn. Code Ann. § 40-6-304(c). The authorization order may not allow interception for a period longer than 30 days, although extensions may be granted. Tenn. Code Ann. § 40-6-304(e). The 30-day period begins on the date law enforcement initiates interception or ten days after the order is issued, whichever is earlier. *Id.* The order shall also require reports to be made to the issuing judge at ten-day intervals, with the first report required on the tenth day after the order is entered. Tenn. Code Ann. § 40-6-308(c). The reports must show what progress had been made toward achievement of the authorized objective and the need for continued interception. *Id.*

Within 30 days after the expiration of the order, the judge issuing an order of authorization shall report to the attorney general and reporter. Tenn. Code Ann. § 40-6-308(a). In turn, the attorney general and reporter shall make reports each January to the administrative office of the federal courts and the speakers of the senate and house regarding the orders of authorization made during the preceding year. Tenn. Code Ann. § 40-6-308(b).

**B. Pertinent Facts**

On June 12, 1998, Hamilton County Criminal Court Judge Stephen M. Bevil signed three orders authorizing the interception of calls from the defendant's cellular and business telephones as well as from Brenda Tripp's cellular phone for a period of 30 days. Interception began on June 17 and ended on June 25. Inspector Michael Mathis of the Chattanooga Police Department gave Judge Bevil verbal updates regarding the progress of the interceptions and provided him with a written report on June 22. Defense counsel requested the state attorney general to send him copies of reports made by Judge Bevil as well as copies of any reports made by the attorney general to the administrative office of the federal courts and to the speakers of the senate and the house of representatives pursuant to Tenn. Code Ann. § 40-6-308(b). He received no response from the attorney general.

The defendant filed a pre-trial motion requesting the trial court to suppress evidence obtained as a result of the interceptions. The motion was overruled by the trial court prior to trial.

At trial, the state presented tapes of three of the defendant's phone calls intercepted on June 19, 1998. In the first phone call, the defendant requested a loan for $1,500 from an unknown man. The defendant advised the man he was expecting a payment from a customer who was an evangelist whose flight from Washington, D.C. had been delayed. The defendant made the second phone call fifteen minutes later to his brother, Eddie Boatfield, in which he requested a loan for $4,500. During this phone call, he told his brother he was expecting payment from a customer whose flight from Arizona had been delayed. The third phone call was between the defendant and Brenda Tripp in which they indicated they were engaged in physical intimacy and a romantic relationship at that time.

## C. Analysis

The defendant maintains that the order of authorization was insufficient on its face; the interceptions were not made in conformity with the order of authorization; and the communications were unlawfully intercepted. However, our review of the affidavits and orders in question reveals they meet the statutory requirements of Tenn. Code Ann. § 40-6-304(a) in all respects.

The defendant further argues the affidavit of Inspector Mathis failed to establish the reliability of witnesses named in the affidavit. Our review of the affidavit does not reveal that it made any reference to any information provided by unnamed or confidential informants. Reliability of the source and information is judged from the entirety of the affidavit. State v. Melson, 638 S.W.2d 342, 356 (Tenn. 1982) (relating to search warrant affidavits). The affidavit was sufficient.

The defendant also maintains law enforcement failed to comply with the reporting requirements of Tenn. Code Ann. § 40-6-308(c). Judge Bevil signed the orders of authorization on June 12, 1998. Oral reports were made to Judge Bevil prior to June 22, and Inspector Mathis made a written report to Judge Bevil on June 22. We, therefore, conclude that Inspector Mathis complied with the reporting requirements of Tenn. Code Ann. § 40-6-308(c).

The defendant further submits the state violated Tenn. Code Ann. § 40-6-308(c) by not providing Judge Bevil with "extension reports" from June 22 until the interceptions were completed on June 25. No further ten-day reports were necessary after June 22 because the interceptions ended three days later. While Tenn. Code Ann. § 40-6-304(e) does mandate applications and court approval before interceptions can continue past the expiration of an order of authorization, it is clear in the instant case the state discontinued the interceptions well before the expiration of the 30-day period allowed by the order.

Finally, the defendant argues the state failed to comply with Tenn. Code Ann. § 40-6-308(a) and (b), requiring the issuing judge to report to the state attorney general and the state attorney general to report to the federal courts and the legislature. His argument is based on the state attorney general's failure to supply him with copies of the reports. From this proof alone, it is unclear whether there was a failure to make the required reports. Regardless, we conclude that suppression

of the contents of intercepted communications is not the proper remedy available for violation of the issuing judge's and state attorney general's reporting requirements.

The Wiretapping and Electronic Surveillance Act of 1994 does provide for suppression as a remedy for certain violations. The contents of intercepted communication or evidence derived therefrom may be suppressed when (1) the interception was unlawful; (2) the order of authorization was insufficient on its face; or (3) the interception was not made in conformity with the order of authorization. *See* Tenn. Code Ann. § 40-6-304(h)(1). Further, contents of intercepted communications or evidence derived from them are inadmissible if the disclosure violated the act or if the interception was illegal. Tenn. Code Ann. §§ 40-6-304(h)(1), -307. However, the failure of the issuing judge's and the state attorney general's requirements to make administrative reports was not included as a violation sanctionable by suppression.

For these reasons, we hold that the evidence obtained by the state through electronic interception was admissible into evidence. We further conclude that even if the recordings were erroneously admitted, the error was harmless. As stated, only three conversations were admitted into evidence. Two calls revealed the defendant's attempts to secure funds while giving inconsistent explanations. The third call related to his relationship with Brenda Tripp following the victim's death. In view of the other evidence in this case, we conclude the admission of these three conversations did not affect the judgment and, if error, was harmless. Tenn. R. App. P. 36(b).

## V. EVIDENCE OF DEFENDANT'S RELATIONSHIP WITH BRENDA TRIPP

The defendant contends his alleged romantic relationship with Brenda Tripp was erroneously admitted into evidence to his prejudice. The state contends this evidence was relevant to the issue of motive. We agree with the state.

### A. Before Victim's Death

Between April 1997 and the victim's death on March 12, 1998, ninety-four calls were made from the defendant's cellular telephone to Brenda Tripp's pager, home, place of employment and cellular telephone. Between June 1997 and the victim's death, thirty-seven calls were made from Brenda Tripp's cellular telephone to Nursery Brokers, the defendant's cellular telephone, the defendant's pager and his residence.

### B. After Victim's Death

It was undisputed that the defendant and Brenda Tripp had a romantic relationship after his wife's death. The state's proof established there were numerous calls from Brenda Tripp's cellular phone to the defendant's phones and from the defendant's cellular telephone to Brenda Tripp's phones following his wife's death. The state also presented a tape of the June 19, 1998, telephone conversation between the defendant and Tripp, which clearly revealed their romantic relationship at that time.

-15-

## C. Analysis

Prior to trial, the defendant moved the trial court to rule evidence of this alleged romantic relationship, both before and after the victim's death, inadmissible under Tenn. Rule Evid. 403. The trial court denied the motion, and the defendant now submits the trial court erred.

The trial court's admission of evidence under Rule 403 will not be disturbed absent an abuse of discretion. State v. McCary, 922 S.W.2d 511, 515 (Tenn. 1996.) If there is material evidence to support the trial court's decision, this court will affirm the trial court. State v. Jackson, 52 S.W.3d 661, 668 (Tenn. Crim. App. 2001). Evidence will be excluded under Rule 403 only where the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of the evidence. Tenn. R. Evid. 403. Unfair prejudice is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997).

The defendant relies upon our unreported case of State v. Frankie E. Casteel, No. E1999-00076-CCA-R3-CD, 2001 WL 329538 (Tenn. Crim. App. filed Apr. 5, 2001, at Knoxville), *perm. to app. denied* (Tenn. Sept. 17, 2001). In Casteel, there were exhaustive references to the defendant's adulterous affair and other prior bad acts which constituted irrelevant character evidence. We found prejudicial error. In the case at bar, the state contended at trial the defendant and Tripp had an adulterous affair before the victim's death, and this was a motive for the homicide. Casteel is distinguishable.

In the case *sub judice*, evidence indicating the defendant was engaged in a romantic relationship with a family friend before the victim's death was relevant to establish a motive for committing murder. The fact that it was ongoing shortly after the victim's death, in light of all the other evidence in this case, was probative as to whether the relationship began prior to the victim's death. We are unable to conclude that the trial court abused its discretion in admitting this evidence. The probative value of this evidence was not substantially outweighed by the danger of unfair prejudice or by any of the other dangers or considerations set forth in Rule 403. Therefore, this issue is without merit.

## VI. ALIBI

The defendant argues the trial court should have given a jury instruction on alibi. Ordinarily, this issue would be deemed waived because the defendant has failed to make appropriate references to the record. *See* Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997); State v. Turner, 919 S.W.2d 346, 358 (Tenn. Crim. App. 1995); *see also* Tenn. R. App. P. 27(a)(7) and (g). Furthermore, defense counsel, in his opening statement, specifically said the defendant was not asserting an alibi defense. However, we elect to address the issue.

Alibi is a defense that places the defendant at the relevant time of the crime in a different place than the crime scene and so removed therefrom as to render it impossible for him to be the guilty party. Black's Law Dictionary 71 (6th ed. 1990). When the credible evidence fairly raises an alibi issue, the trial court is required to give an alibi instruction whether requested or not. Moffitt v. State, 29 S.W.3d 51, 57 (Tenn. Crim. App. 1999). The failure to do so is reversible error. Poe v. State, 212 Tenn. 413, 370 S.W.2d 488, 491 (1963).

In the instant case, there was no proof the defendant was so removed from the scene that it was impossible for him to have been the perpetrator. Instead, the only proof submitted showed the defendant could have been present at the time of the commission of the offense. As defense counsel stated during the hearing on the motion for new trial, the defendant never contended it was impossible for him to have committed the offense. Instead, he argued "he might not have done it because of the many things that took place." We conclude the trial court did not err in failing to give a charge regarding alibi.

## CONCLUSION

Accordingly, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE