IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

APRIL 1999 SESSION

FILED

August 4, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| TERRY LYNN ANTHONY, | ) | |
| | ) | |
| Appellant, | ) | No. 02C01-9805-CC-00159 |
| | ) | |
| | ) | Tipton County |
| v. | ) | |
| | ) | Honorable Joseph H. Walker, Judge |
| | ) | |
| STATE OF TENNESSEE, | ) | (Post-Conviction) |
| | ) | |
| Appellee. | ) | |


For the Appellant:

C. Michael Robbins
46 North Third, Ste. 719
Memphis, TN 38103

For the Appellee:

Paul G. Summers
Attorney General of Tennessee
    and
J. Ross Dyer
Assistant Attorney General of Tennessee
    and
Michael E. Moore
Solicitor General
425 Fifth Avenue North
Nashville, TN 37243-0485

Elizabeth T. Rice
District Attorney General
    and
James Walter Freeland, Jr.
Assistant District Attorney General
302 E. Market Street
Somerville, TN 38068


OPINION FILED:_____


AFFIRMED

Joseph M. Tipton
Judge

## O P I N I O N

The petitioner, Terry Lynn Anthony, appeals as of right from the Tipton County Circuit Court's denial of his petition for post-conviction relief. This court reversed the petitioner's original convictions for first degree murder and attempted voluntary manslaughter and remanded the case for a new trial because the petitioner appeared before the jury in shackles throughout his first trial. State v. Terry Lynn Anthony, No. 02C01-9408-CC-00173, Tipton County (Tenn. Crim. App. May 10, 1995). Just before his second trial, the petitioner pled guilty to attempted voluntary manslaughter and received a two-year sentence on one count. A Tipton County jury convicted the petitioner of first degree murder, and the trial court imposed a life sentence to be served in the Department of Correction. This court affirmed that conviction. State v. Terry Lynn Anthony, No. 02C01-9605-CC-00159, Tipton County (Tenn. Crim. App. Mar. 18, 1997). The petitioner contends that the trial court denied him the opportunity for a full and fair post-conviction hearing by:

> (1) quashing the subpoenas of jurors whom the petitioner intended to question about the effectiveness of the voir dire,
>
> (2) quashing the subpoena of the assistant district attorney whom the petitioner intended to question about plea offers, and
>
> (3) preventing the petitioner from eliciting evidence of course of conduct or habit.

He also contends that he received the ineffective assistance of counsel in his second trial because:

> (1) his attorney did not seek to have his statement suppressed,
>
> (2) his attorney inadequately prepared the petitioner to testify at trial, and
>
> (3) his attorney misadvised him regarding not informing the jury of his plea to attempted voluntary manslaughter on count one of the indictment.

We affirm the trial court's denial of the petition for post-conviction relief.

2

This court's opinion on direct appeal states the evidence presented at the petitioner's trial as follows:

> The defendant and his wife, Jacqueline Anthony, had been separated for several years. They had two sons who were in the physical custody of the victim; they lived with the victim's mother, Mary Maclin. At about 7:00 A.M. on August 23, 1993, the defendant stopped at the Maclin residence and learned from his two sons, who were waiting outside for their school bus, that the victim had spent the night before with a male friend, Charlie L. Boyce, Jr. The defendant drove away from the Maclin residence, stopped his car to load a shotgun, and then drove until he saw the Boyce vehicle; Boyce and the victim were inside, traveling toward the Maclin residence. Boyce and the victim left their car and ran toward the residence of William Dowell. The defendant followed them and fired several shots at their car before the victim, shot in the knee, was disabled. Boyce was able to get inside the Dowell residence just as the defendant, from a distance of two to six yards, shot the victim in the chest and head.
>
> The victim's brother, Walter Maclin, Jr., was at the Maclin residence on the day of the shooting when, at about 7:15 A.M., the defendant stopped to talk to his sons. Maclin saw the defendant drive away and then return, following the Boyce vehicle. He observed the defendant fire four shotgun blasts at the Boyce vehicle. Later, Maclin overheard the defendant, who was armed, say, "I done killed your damn sister; so call the m-f-police."
>
> . . . .
>
> The defendant testified at trial that he and the victim had experienced several problems associated with marital infidelity. He claimed that he had contracted gonorrhea from the victim and, after their separation, that he had tried to commit suicide. The defendant testified that he had just ended his relationship with Robin Blevins, one which had produced two children, when he and the victim, only a few days before the murder, discussed trying to get back together. The defendant described himself as very upset on the day of the murder. He claimed that his heart was broken and that he was out of his mind.

Anthony, slip op. at 3-5.

At the post-conviction evidentiary hearing, the petitioner testified that his trial attorney came to see him three times and that he also spoke with his attorney by telephone. He said that his attorney first met with him at the jail, and the meeting lasted for one and one half-hours. He said that they primarily discussed trying to prevent the state from using the gun as an exhibit and the statement that the petitioner gave to

Captain Mike Forbess of the Tipton County Sheriff's Department. He said that he told his attorney that Captain Forbess told him that he had to give a statement because a lawyer would not do him any good. The petitioner said that Captain Forbess told him this as soon as he sat down and that it made him feel like his life was thrown away and like he did not have any hope. He agreed that he made the statement because of what Captain Forbess told him. During the course of his testimony, the petitioner said that Captain Forbess advised him of his rights after he gave his statement and that he signed a waiver and then made the statement. He said that at the time he made his statement, he was still upset and crying. He said that Captain Forbess wrote the statement and then read it to him. He said that he could not understand many of the words in the statement.

The petitioner testified that his attorney told him that he would talk to Captain Forbess about the statement. He said that after this meeting, he never heard the words "motion to suppress" and that he and his attorney never discussed his statement again. He said that his attorney came to see him on November 4, and they went over his statement. He said that he did not remember what his attorney said about the statement, but the attorney did say that he was going to talk to Captain Forbess and the state in order to try to exclude the statement. He said his attorney never advised him to testify that Captain Forbess told him that a lawyer would not do him any good, but he decided to mention it because he wanted the jury to know what Captain Forbess had told him.

The petitioner testified that on November 2, 1995, his attorney visited him at the jail and discussed a plea offer. He stated that the attorney said that in exchange for a guilty plea, the state had offered to reduce the charge of attempted first degree murder of Mr. Boyce to attempted voluntary manslaughter with a four-year sentence and to reduce the charge of first degree murder of his wife to second degree murder

4

with a twenty-five- year sentence. He said he told his attorney that he would accept the plea, and his attorney said that he would get back to him on Friday. He said that on November 4, his attorney told him that the state had withdrawn the plea because the victim's family did not agree with it.

The petitioner testified that just before trial, he accepted another plea offer of attempted voluntary manslaughter of Mr. Boyce with a two-year sentence. He said that his attorney did not explain to him how his plea on this charge related to the remaining charge. He said he was told that his attorney and the state had agreed not to let the jury know about the plea, but the petitioner said he did not understand why. The petitioner testified that he did not know his attorney's reason for not wanting the jury to know about the plea and that his attorney told him that he did not want the jury to know that the petitioner had pled guilty to a serious felony. He said Mr. Boyce testified that the petitioner had fired a gun at him and had put him in fear.

The petitioner testified that his attorney never spoke with him about the different mental states required for manslaughter and murder. The petitioner testified that his attorney did not prepare him for cross-examination by the state. He said that during cross-examination, he told the jury that various aspects of his history with his wife had nothing to do with what he did on the day of the murder. He said this was not what he meant to tell them. He said these things were not on his mind at the time he committed the crime.

The petitioner's trial attorney testified that he was licensed in April of 1993, that he represented the petitioner in the retrial of his case on November 7 and 8, 1995, and that this was his first murder trial as lead counsel. He said that at the time, he had experience with Fourth Amendment claims and motions to suppress and that he talked with the petitioner in detail about his statement. He said the petitioner told him

that he was crying, confused and distraught when he made the statement. He said he considered filing a motion to suppress at length, but he decided not to file the motion because he thought that there was no question of whether the petitioner committed the acts.

The attorney testified that the defense strategy was that the crime was one of passion or at least second degree murder. He admitted that the petitioner's statement could support a finding of premeditation and deliberation, but he said that the fact that the statement was so clinical and technical allowed him to question Captain Forbess about things the petitioner had told him that he had left out of the statement. He said he did not remember the petitioner telling him that while advising the petitioner of his Miranda rights, Captain Forbess told him that a lawyer would not do him any good. He said that if he had been told this, he would have considered it in deciding whether to file a motion to suppress, but he still would not have filed the motion.

The attorney testified that he thought the statement also suggested voluntary manslaughter. He said that he talked with the petitioner about his mental state at the time of the offenses and that he wanted to show this mental state by showing that the petitioner was very upset during his interview with Captain Forbess. He said that he also wanted to show that Captain Forbess did not include everything that the petitioner told him in the statement. He said he did not recall any specific reason for having the petitioner testify that Captain Forbess had told him that a lawyer would not do him any good.

The attorney testified that he discussed the possibility of a plea with the state when he was substituted as counsel for the petitioner, which the trial court noted occurred about three months before the trial. He said that the state's only offer was for first degree murder with life imprisonment because the prosecutor said that he had

6

obtained a conviction of the petitioner once and felt he could do it again. He said that the state made the same offer just before trial. He said that the state also offered to reduce count one regarding the shots fired at Mr. Boyce to attempted voluntary manslaughter with a two-year sentence. He said that the sentence represented time that the petitioner had already served in the case. He said he would have talked to the petitioner about the plea, but he did not recall what he told him. He said that the petitioner accepted the plea.

The attorney testified that as a part of the plea, the petitioner and the state agreed not to mention the plea to the jury. He said he did not want the jury to know that the petitioner had an earlier trial and had pled guilty to a serious felony. He admitted that the facts showed that just seconds separated the shots fired at the two victims, but he said that he did not see a connection between the plea on one count and the trial on the other.

The attorney testified that during voir dire, he asked one of the prospective jurors whether she would be able to consider lesser degrees of criminal homicide. He said that he then asked this question of the jury as a whole in an attempt to inform the jury that there was more to this case than just first degree murder. He said that he did not recall what the jurors' specific answers were or why he chose not to ask this question of each juror individually.

The attorney testified that he did not know if he specifically discussed the elements of manslaughter and murder with the petitioner but that he did discuss the petitioner's act and a plan for his defense. He said that although he did not specifically recall discussing the petitioner's testimony with him, it was his practice to discuss a client's testimony with the client before trial. He admitted that before trial, he knew of the petitioner's tumultuous relationship with his wife, of their planned reconciliation and

that the petitioner learned that his wife had been out all night with Mr. Boyce just before the shootings. He said he thought that the state's cross-examination of the petitioner on these matters did not go to the petitioner's mental state at the time of the offenses. He said he did not remember why he did not try to rehabilitate the petitioner after his cross-examination.

On cross-examination, the attorney testified that he reviewed the transcript of the petitioner's first trial extensively and that the same basic facts came out in the second trial. He said he discussed the first trial, including trial strategy, with the petitioner's attorney in that trial. He said he had found that jurors get irritated if days are spent asking them the same question in voir dire. He said that generally if he wants to educate the jury on a point, he asks several jurors a question on that point, and then he watches the rest of the jury to see if they are nodding their heads. He said that if he feels satisfied that the jury understands his point, then he moves on to another question. He said the petitioner's testimony was important, but he also considered that the petitioner might be cross-examined on any variation in his testimony from what he said at his first trial. He said he was bound by what the petitioner said in the first trial.

Mike Forbess testified that he was the Tipton County Circuit Court Clerk at the time of the petitioner's second trial. He said that in August 1993, he was a captain with the Tipton County Sheriff's Department and that he took the petitioner's statement regarding the shootings. He said the petitioner was upset and crying at the time that he gave his statement. He said he did not think that he was taking advantage of the petitioner's emotional state by getting him to sign a Miranda waiver and questioning him at that time. He said that although he had very little specific recollection of the petitioner's interview, he generally reads the Miranda form to the suspect. He said he did not recall saying anything else to the petitioner about his right to counsel aside from

8

what was on the form.  He said he did not tell the petitioner that a lawyer could not do him any good.

Captain Forbess testified that he knew that he was going to be a witness at the petitioner's trial and that he believed that he had one of his deputies serve as clerk until after he testified.  He said he did not recall testifying on the first day of the trial but acknowledged that he probably resumed his seat next to the judge on the day after he testified.  He said he did not remember if he came back into the courtroom or how often he returned to the courtroom after his testimony, but his usual practice was to be in and out during a trial.  He said that as clerk, he had contact with the jurors in an administrative capacity.

The trial court denied the petition for post conviction relief.  It found both that the attorney's performance was within the range of competence demanded of attorneys in criminal cases and that the petitioner had failed to show he was prejudiced.

## I.  POST-CONVICTION HEARING

The petitioner contends that he was denied a full and fair hearing on his post-conviction claims because the trial court (1) quashed the jurors' subpoenas, (2) quashed the assistant district attorney's subpoena, and (3) found certain conduct or habit evidence irrelevant.  In House v. State, 911 S.W.2d 705, 711 (Tenn. 1995), our supreme court determined that a petitioner receives a full and fair hearing when given an opportunity to present his or her constitutional claims at a meaningful time and in a meaningful manner, that is, without undue restriction of the scope of the hearing or undue limitation on the introduction or presentation of evidence.

## A.  JURORS' SUBPOENAS

9

The petitioner contends that the trial court erred in quashing the subpoenas of jurors whom he sought to question regarding the ineffectiveness of trial counsel's voir dire. The petitioner argues that although trial counsel initially questioned two jurors individually about whether they would be able to consider the lesser degrees of homicide, trial counsel was ineffective because he failed to obtain a clear answer from these two jurors and because he questioned the remaining jurors as a group. He argues that by quashing the jurors' subpoenas, the trial court denied him the opportunity to establish prejudice by showing that trial counsel could have made a propter affectum challenge to one or more of the jurors if he had questioned them individually on this issue and had obtained a clear answer from each one. The state contends that the trial court properly quashed the subpoenas because the petitioner's reason for questioning the jurors was not permissible under Rule 606(b), Tenn. R. Evid., which prohibits a juror from testifying about deliberations. The state also argues that the petitioner presented no evidence that any of the jurors were dishonest when they indicated during voir dire that they would be able to consider lesser offenses.

> Rule 606(b), Tenn. R. Evid., states:
>
> Upon an inquiry into the validity of a verdict . . ., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind . . ., except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion . . . .

Before the evidentiary hearing, the petitioner filed a motion requesting that the trial court authorize interviews with the jurors to question them about how they would have individually responded to a voir dire question on their ability to consider lesser degrees of homicide. The trial court declined to grant the motion, stating that Rule 8, Tenn. Sup. Ct. R., allows counsel to communicate with jurors without the trial court's prior approval to determine if the verdict can be challenged under one of the factors listed in Rule

10

606(b), Tenn. R. Evid. In its order denying the motion, the trial court noted that the petitioner's proposed inquiry did not fall within one of the exceptions to Rule 606(b), that the jury swore to consider the evidence and the law, and that it charged the jury on several lesser degrees of homicide. The trial court stated that having already determined that the petitioner's inquiry did not fall within Rule 606(b), it directed that the jurors not be subpoenaed for the post-conviction hearing.

Because the petitioner sought to question the jurors about voir dire rather than about deliberations, Rule 606(b) does not bar their testimony. See State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim App. 1993). In Akins, the defendant was charged with vehicular homicide and despite straightforward questioning of the jury panel by both sides, a juror failed to reveal that she had worked as a probation officer, a D.U.I. probation counselor and in an alcohol and drug rehabilitation program. This court noted that Rule 606(b) did not apply to a juror's testimony about voir dire and did not bar "a challenge on the ground of propter affectum." Id. at 355.

However, any error would be harmless because the trial attorney's decision to question the jury panel individually or as a group is a legitimate tactical choice. In Akins, this court held that a presumption of bias arises when a juror's response to either individual or general voir dire questions fails to "fully and fairly inform counsel of the matters which reflect upon a juror's possible bias . . ." Id. at 357. Furthermore, "[s]ilence on the juror's part when asked a question reasonably calculated to produce an answer is tantamount to a negative answer." Id. at 355. During voir dire in the present case, the attorney asked the panel if anyone had a problem with finding a person who took another's life guilty of a lesser degree of homicide than first degree murder. The trial attorney was entitled to rely upon the potential jurors' silence in the same way he would have been entitled to rely upon a negative answer from each

11

member of the panel. The trial attorney's decision to question the jury panel in this way was within the level of competence required of attorneys in criminal cases.

## B. ASSISTANT DISTRICT ATTORNEY'S TESTIMONY

The petitioner contends that the trial court erred in quashing his subpoena of the assistant district attorney, thereby denying him the opportunity to question the assistant district attorney about plea negotiations with the petitioner's attorney. He argues that the assistant district attorney's testimony could have revealed the existence of an enforceable plea agreement, which was breached by the state. The state asserts that the assistant district attorney received a subpoena duces tecum and responded that no documents concerning the plea negotiations in question existed. The state also argues that because it can withdraw a plea offer any time until the trial court accepts the agreement, the existence and details of pretrial plea agreements are not relevant to the determination of whether the petitioner's constitutional rights were violated.

The petitioner's amended petition alleges that his attorney was ineffective for not seeking the specific performance of a plea to second degree murder with a recommended sentence of twenty-five years. In its answer, the state responds that it never told the petitioner's attorney that it would offer the petitioner a plea to second degree murder with a twenty-five-year sentence. At the evidentiary hearing, the assistant district attorney objected to the petitioner calling him as a witness because he "represented" the petitioner's attorney in the present proceeding. He also noted that the attorney could testify about any plea negotiations conducted by the state. The assistant district attorney stated that he had received a subpoena duces tecum, rather than a subpoena to testify, and that no documents relating to plea discussions between the state and the petitioner's attorney existed.

The trial court granted the state's request that the assistant district attorney not be required to testify. In its order denying post-conviction relief, the trial court accredited the trial attorney's testimony that the state made no second degree murder offer. Initially, we note that our review of the record reveals no indication that the trial court quashed a subpoena for the assistant district attorney to testify. The assistant district attorney stated that he received a subpoena duces tecum but that none of the requested documents existed.

We hold that the trial court erred in granting the assistant district attorney's request that he not be required to testify. Relevant evidence, that is, evidence that tends to make a material fact more or less probable, is admissible unless excluded by a specific rule or law. Tenn. R. Evid. 401, 402. The Tennessee Rules of Evidence apply in a post-conviction hearing. Tenn. Code Ann. § 40-30-210(e). The petitioner was entitled to call the assistant district attorney because he could have testified about the existence of the alleged plea agreement.

The error, though, is harmless because even if the plea offer or agreement existed, it was not enforceable. The petitioner's attorney testified that the state did not make an offer for second degree murder. The petitioner himself testified that his attorney told him that when the attorney tried to accept the offer on the petitioner's behalf, the state withdrew it. The state may revoke any plea offer until the plea is accepted by the trial court. State v. Turner, 713 S.W.2d 327, 329 (Tenn. Crim. App. 1986) (citing Mabry v. Johnson, 467 U.S. 504, 510-11, 104 S. Ct. 2543, 2548 (1984)). A plea agreement is not enforceable until the trial court accepts it. State v. Todd, 654 S.W.2d 379, 382 (Tenn. 1983); Turner, 713 S.W.2d at 329. Thus, even if the plea offer existed as the petitioner claimed, its existence would not reflect upon the attorney's effectiveness because the alleged agreement had not been accepted by the trial court.

13

The petitioner cites to State v. Howington, in which our supreme court held that informal immunity agreements are enforceable under contract law. 907 S.W.2d 403, 408 (Tenn. 1995). In Howington, the court found no reason to distinguish between immunity agreements and plea agreements, which "have been treated as contracts and are enforceable once the condition precedent is met; that is, the trial judge accepts the agreement." Id. at 407 (citations omitted). In this case, the condition precedent, the trial court's acceptance of the alleged agreement, had not been met.

## C. EVIDENCE OF HABIT

The petitioner contends that the trial court erred in sustaining the state's objection to the relevance of his question to Captain Forbess on whether in the course of his experience interrogating suspects and advising them of their Miranda rights, he had ever thought that an attorney would be of no use to the suspect. The petitioner argues that because Captain Forbess testified that he remembered very little about the circumstances surrounding the petitioner's waiver of rights, his testimony on whether he had thought that an attorney would be useless in other cases would be akin to evidence of habit and practice relevant to prove conduct in conformity. Evidence of habit is relevant to prove that a person's conduct on a particular occasion conformed with the person's habit or routine practice. Tenn. R. Evid. 406(a). "A habit is a regular response to a repeated situation." Tenn. R. Evid. 406(b). Evidence is relevant if it tends to make a material fact more or less probable. Tenn. R. Evid. 401. The fact that Captain Forbess once thought or even habitually thought that an attorney would be of no use to a suspect does not make it more probable that he told the petitioner that a lawyer would be of no use to him. The trial court properly sustained the objection.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends that he received the ineffective assistance of counsel. In a post-conviction case, the petitioner must prove his grounds for relief by

clear and convincing evidence. Tenn. Code Ann. § 40-35-210(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). In this respect, the petitioner, as the appellant, has the burden of illustrating how the evidence preponderates against the judgment entered. Id.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied, as well, to the right to counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn.), cert. denied, 493 U.S. 874 (1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court stated that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (counsel's conduct will not be measured

by "20-20 hindsight").  Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance.  Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation.  See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201.

Also, we note that the approach to the issue of the ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct.  If prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance.  Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

## A. SUPPRESSION OF STATEMENT

The petitioner contends that his attorney was ineffective for failing to file a motion to suppress the statement he gave to Captain Forbess.  He argues that he was prejudiced by this failure because the statement contained evidence of premeditation and deliberation, which contradicted his claim that he shot his wife while in a state of passion.  The petitioner argues that a different result is probable because the jury would have decided whether the petitioner committed murder or manslaughter based upon the petitioner's testimony about his state of mind without the statement essentially admitting the elements of premeditation and deliberation. The state contends that the attorney made a tactical decision not to oppose the statement but instead to use the circumstances surrounding the making of the statement to support the defense theory.

At trial, the state introduced the petitioner's statement in its case-in-chief during the testimony of Captain Forbess.  Captain Forbess testified that on the day of the shootings, he was a captain with the Tipton County Sheriff's Department.  He said that he went to the crime scene that morning, talked with eyewitnesses, and then interviewed the petitioner at the jail.  He said that he read the waiver of rights form to the petitioner, who appeared to understand it and signed it.  The waiver, which was

16

introduced as an exhibit at trial, reveals that the petitioner signed it at 10:35 a.m.

Captain Forbess said that the petitioner signed the statement and initialed each page at the top and at the bottom. The statement relates as follows:

On 8/22/93 I saw Jackie Terry, [sic] my wife, at her sister's house. It was around 7:00 p[.m.] I told her there had been a boy at her mother['s] house looking for her. Jackie and I have been separated for about 2 1/2 years but we still dated and were planning to get back together. Later that night at about 9:00 p[.m.,] I called to Jackie's mother['s] house where Jackie was living and ask[ed] Jackie's mother if Jackie was there. She said Jackie was in the bed and didn't want to talk to me. I called back to the house the next morning and my 8 year old son answered the phone. I ask[ed] him if his mama (Jackie) was home and he said she left last night with some boy and had been gone all night and still wasn't home. I got in my car and went to Jackie's mother['s] house. I got there at about 7:20 a[.m.] Jackie still wasn't home. I talked to my sons. I told them that I wouldn't be around for them anymore. I knew I was going looking for Jackie and I was going to kill her because I had told her several times that if I ever caught her with another man that I was going to kill her. After I left her mother['s] house, I stopped on the side of the road and loaded my shotgun. I had a pistol in my car also but it always stayed loaded. I started down the road going to look for Jackie when I met her in a car that was driven by Charlie Boyce. I turned my car around and chased them to her mother['s] house. They pulled in the driveway. I stopped my car in the road in front of the house and shot at their car. They took off driving behind the house. They came from behind the house and got back in the road. I shot at them again when they were going down the road. I got in my car and started backing up in the road. Their car had quit on them and they had gotten out of the car and started running across the yard. I got out of my car and was chasing them. I was carrying my shotgun. They ran to the back of Billy Dowell's house. I didn't see Charlie go in the house. When I came around the corner of the house, Jackie was on the deck fixing to go in back of the house. I shot her in the leg first and she fell. I shot her again after she fell. I don't remember how many more times I shot. She never said anything to me. She knew she was wrong and that I was going to kill her. She had told me before that if I ever caught her with another man to just go ahead and kill her.

After I killed her I went to my house and told my mother and my brother (Darryl Anthony) what I had done. I was going to turn myself in in Mason. I saw my daddy in Mason and told him what I had done. Then Chief Blade came by and my daddy flagged him down and I told him what happened and he carried me to the Covington Jail. I gave my pistol to my daddy. The only time I shot my pistol was when I was chasing Jackie and Charlie when they were on the way to Jackie's house.

17

When I first shot at Jackie and Charlie with the shotgun at Jackie's house, her brother, John Rutherford, came out of Jackie's house and shot at me with a pistol.

On cross-examination at trial, Captain Forbess testified that when he first saw the petitioner, the petitioner was upset, shaking and crying. He said that the petitioner had been in custody for a couple of hours at this point. He stated that the petitioner paid attention while he read the waiver form. Captain Forbess admitted that he did not ask the petitioner if he would like to wait until another time to make a statement or if he would like to write out the statement himself. He said he did not think that he took advantage of the petitioner's emotional state, and he did not make a tape or video recording of the interview. He said he thought tape recorders tended to make suspects "clam-up." He stated that while he did not remember asking the petitioner whether he could read or write, he usually asked another officer to witness the statement if the defendant could not read. He said that, therefore, he assumed that he asked the defendant whether he could read to some degree. He said that he summarized what the petitioner told him, read it back to the petitioner, and had the petitioner sign it. He agreed that it was possible that the petitioner told him that he was crazy or out of his mind at the time of the shooting even though this was not included in the statement.

At trial, the petitioner testified that he stayed in a holding cell for two hours before he met with Captain Forbess. He said that Captain Forbess told him that he had to give a statement because a lawyer would not do him any good. He said that he was still crying and upset at this time, and that he had never been in trouble or arrested before. He denied telling Captain Forbess that if he ever caught his wife with another man, he would kill her or that he told his sons he would not be around for them anymore. He said that he did not remember Captain Forbess reading the statement to him. He stated that he signed the statement because Captain Forbess told him he had to sign it.

18

On cross-examination at trial, the petitioner testified that he did tell Captain Forbess that he and his wife had agreed not to date anyone else but that he did not say it the way Captain Forbess worded it in the statement. He said that he did not remember telling Captain Forbess that he told his wife that Mr. Boyce was looking for her on Sunday. He said that he told her that Mr. Boyce was at her mother's house. He said that he told Captain Forbess that no one answered when he called his mother-in-law's house on Monday morning, not that he spoke with his son. He said that he also did not tell Captain Forbess that he told his sons that he would not be seeing them anymore, that he had warned his wife he would kill her if he ever caught her with another man, or that he stopped and loaded his shotgun beside the road. He said that he did not have a pistol in his car that day. He said that he lost control of his mind and that his wife's death was an accident.

At the post-conviction evidentiary hearing, the petitioner testified that he was upset and crying at the time he spoke with Captain Forbess. He said that he gave the statement because Captain Forbess told him that he had to make a statement because an attorney would not do him any good. The petitioner said that Captain Forbess made this comment as soon as they began talking. He said that he signed a rights waiver before he gave his statement. The petitioner also testified that Captain Forbess advised him of his rights only after he made the statement. At the hearing, Mr. Forbess denied telling the petitioner that an attorney would not do him any good.

We turn first to the question of whether a basis for suppressing the statement exists because otherwise the petitioner has not been prejudiced by his attorney's failure to move to suppress the statement. See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. If an individual is interrogated by a state agent while in custody, the agent must inform the person of his or her right to remain silent and of the resulting consequences if the individual decides not to exercise that right. Miranda v. Arizona,

384 U.S. 436, 467-69, 86 S. Ct. 1602, 1624-25 (1966); State v. Smith, 933 S.W.2d 450, 453 (Tenn. 1996). An individual is in custody if "deprived of his freedom of action in any significant way." Oregon v. Mathiason, 429 U.S. 492, 494-96, 97 S. Ct. 711, 713-15 (1977); Smith, 933 S.W.2d at 454. Before a defendant can knowingly and voluntarily waive his Miranda rights, the defendant must be "adequately and effectively apprised of his rights." State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). Thus, if Captain Forbess took the petitioner's statement before he advised the petitioner of his rights, the statement is not admissible.

A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently." Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). The state has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his or her Miranda rights, courts must look to the totality of the circumstances. Middlebrooks, 840 S.W.2d at 326. Due process requires that "convictions following the admission into evidence of confessions which are involuntary, i. e., the product of coercion, either physical or psychological, cannot stand." Rogers v. Richmond, 365 U.S. 534, 540, 81 S. Ct. 735, 739 (1961) (analyzing a confession obtained after the interviewing officer feigned an order to bring the petitioner's wife in for questioning); see Smith, 933 S. W.2d 455. Confessions obtained "by the exertion of any improper influence" are inadmissible. Bram v. United States, 168 U. S. 532, 542-43, 18 S. Ct. 183, 187(1897). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." Smith, 933 S.W.2d at 455. Coercion on the part of the state agent must be present. Id. The pivotal inquiry is "'whether the behavior of the state's law enforcement officials was such as to overbear the petitioner's will to resist and bring about confessions not freely self-determined' . . . ." State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers, 365 U.S. at 544, 81 S. Ct. at 741).

20

Looking at the totality of the circumstances in the present case, the petitioner had only been incarcerated for two hours before he spoke with Captain Forbess. Both the petitioner and Captain Forbess testified that the petitioner was crying and visibly upset during the interview. The petitioner testified that he had never been arrested or in legal trouble before this incident. If Captain Forbess told the petitioner that he had to make a statement and that an attorney would be of no use to him, then such a comment, given the petitioner's emotional state and lack of experience, could have overborne the petitioner's capacity to voluntarily waive his rights. Unfortunately, the trial court below made no findings regarding whether Captain Forbess advised the petitioner of his rights before he gave the statement or whether it accredited the testimony of Captain Forbess or the petitioner concerning the alleged comment about an attorney being of no use. Instead, the trial court found that the attorney's decision not to file a motion to suppress was a tactical choice.

The trial court also found that the petitioner was not prejudiced by the admission of his statement because his trial testimony was substantially similar to the statement he gave to Captain Forbess. The petitioner argues that the evidence preponderates against this finding. While our review of the statement and the petitioner's trial testimony reveals that they generally coincide, we believe that the differences are significant, especially with regard to the petitioner's stated intentions when he left his two sons on the morning of the offense. Thus, we agree that the evidence preponderates against this finding.

In any event, even if the statement should have been suppressed, the petitioner still has not shown that he was prejudiced by his attorney's failure to file a motion to suppress. Because the petitioner chose to testify, he would have been cross-examined regarding the statement he gave irrespective of whether the statement was admissible in the state's case-in-chief. A statement which is inadmissible against the

21

defendant in the prosecution's case-in-chief because of a <u>Miranda</u> violation but which otherwise satisfies legal standards for trustworthiness may properly be used for impeachment purposes to attack the testifying defendant's credibility. <u>Harris v. New York</u>, 401 U.S. 222, 225-26, 91 S. Ct. 643, 645-46 (1971); <u>State v. Hopper</u>, 695 S.W.2d 530, 538 (Tenn. Crim. App. 1985). Our supreme court, following <u>Harris</u>, has held that illegally obtained evidence is admissible only to impeach the defendant's testimony at trial and that the jury must be instructed that it consider the illegal evidence with regard to the defendant's credibility, not his or her guilt. <u>Brewer v. State</u>, 501 S.W.2d 280, 283 (Tenn. 1973) (holding that evidence from an illegal search was inadmissible even to impeach because the defendant did not refer to the evidence in his direct examination); see <u>Pyburn v. State</u>, 539 S.W.2d 835, 841 (Tenn. Crim. App. 1976) (holding that a defendant's statement taken in violation of <u>Miranda</u> is admissible only to impeach the defendant's testimony and that the jury must be instructed to consider the statement only in relation to the defendant's credibility). In this case, the petitioner testified in his own defense, and his trial attorney noted that he was the only witness who could support their theory of passion. Thus, even if the petitioner's attorney were successful on a motion to suppress the statement, the state would have impeached him with it.

The petitioner has failed to show by clear and convincing evidence that the outcome of his trial in the absence of his statement in the state's case-in-chief would probably have been different. In its order denying post-conviction relief, the trial court found:

> The proof of guilt of the petitioner was overwhelming. Eyewitnesses to the shooting testified. Witnesses testified about the acts and demeanor of petitioner before, during, and after the event. Petitioner testified concerning his relationship with the deceased, and presented his side to the jury. Petitioner is distressed that the jury did not find he acted out of passion for his wife being in the car with another man, totally overlooking the fact that petitioner and his wife had been separated for several years, and that petitioner had been living with another woman during that time and had fathered two children with [that other] woman. Considering the events of that day, two separate juries in Tipton County found that the

22

> defendant acted in an intentional and premeditated way, and committed first degree murder. This court agrees with the conclusion reached by those twenty-four people. Even though the defendant described himself as upset and that his heart was broken, he, in fact, set out to commit murder and did commit murder. Considering the totality of the evidence before the jury, the court believes that the verdict would have been the same even if the trial strategy had been more in line with what the petitioner suggests it should have been in his "twenty-twenty hind sight."

The total evidence presented and the use of the statement to impeach the defendant's testimony leave no room for our confidence in the fairness of the outcome of the trial to be undermined.


## B. INADEQUATE TRIAL PREPARATION

The petitioner contends that his attorney was ineffective because he inadequately prepared the petitioner to testify at trial. He argues that the attorney failed to explain the elements of first degree murder or voluntary manslaughter or how the evidence might prove either of the two offenses. He asserts that his attorney also failed to prepare him for cross-examination on his mental state at the time of the incident. He argues that he did not understand the import of the cross-examination questions on the history of his relationship with the victim, resulting in him answering that their history had no bearing on what he was feeling at the time of the homicide. The state contends that the attorney adequately prepared the petitioner for trial and that the petitioner's dissatisfaction with his testimony on cross-examination does not equate with ineffectiveness in his attorney's preparations. We agree.

The petitioner's attorney testified that although he did not recall everything he discussed with the petitioner, he knew that they discussed the defense strategy that the petitioner acted out of passion. The attorney also said that it was his practice to review his a clients' testimony with them before trial. The trial court found:

> [The attorney] testified that he spoke with the family of the [petitioner] a number of times, and consulted with the [petitioner] several times. He spent hours going over the

23

transcripts of the first trial, and spent hours discussing the case with . . . the attorney who represented petitioner at the first trial. [He] spoke with witnesses, developed a trial strategy, and went over the trial strategy with [the petitioner].

At trial, the petitioner testified about the turbulent history of his relationship with the victim. The petitioner said that on the morning of the incident, his sons told him that the victim had been out all night with another man. He testified that when he saw his wife and Mr. Boyce together a short time later, all he could think about was how happy his sons were when they learned that he and the victim were planning to reunite. On cross-examination, the petitioner again said that this was what was on his mind at the time of the incident. At the post-conviction evidentiary hearing, even though the petitioner testified that he did not mean to tell the jury that certain aspects of his history with the victim had no bearing on what he did on the day of the offense, he continued to assert that his turbulent history with the victim was not on his mind at the time he committed the crime. The petitioner has failed to point out how any additional or different pretrial preparation would have yielded another result.

## C. GUILTY PLEA

The petitioner contends that his attorney was ineffective for recommending that he accept an offer to plead guilty to the attempted voluntary manslaughter of Mr. Boyce because the offer contained the additional agreement not to inform the jury of the plea. He argues that as a result of this provision, the jury never learned of the state's mutually exclusive positions on the petitioner's mental state at the time of the shooting: that the petitioner acted out of passion when he shot toward Mr. Boyce and then just seconds later, he acted with premeditation and deliberation when he shot his wife. The petitioner also argues that the negotiation for this provision cannot be considered an informed defense tactic on the part of the attorney because he did not discuss the ramifications of this provision with the petitioner. The state

24

contends that the attorney's attempt to keep the jury from learning about the plea was a tactical decision which should not be second-guessed.

The petitioner testified that his attorney did not explain to him how his guilty plea on count one related to the remaining charge. He said that his attorney told him about the agreement with the state not to tell the jury about the plea. He said that his attorney told him that he did not want the jury to know that he had pled guilty to another felony. He said that he did not understand the agreement. The petitioner's attorney testified that he would have talked to the petitioner about the plea, but he did not recall what he told him. He said that he thought the agreement to keep the plea from the jury benefitted the petitioner because he did not want the jury to know that the petitioner was convicted in an earlier trial and had pled guilty to a serious felony. The petitioner argues that the jury learned the facts surrounding the shooting anyway through the testimony of Mr. Boyce.

The trial court found that the petitioner knowingly and voluntarily entered the plea. Regarding the agreement to withhold information about the plea from the jury, the trial court found:

> This court can not [sic] look back and try to determine whether the jury should or should not have been told of the plea, but finds that it is not ineffective assistance of counsel to make a decision one way or the other. It's a tactical decision.

Evidence of unsuccessful plea negotiations is barred by Rule 410, Tenn. R. Evid., but "[n]othing in the rule excludes evidence of plea negotiations (and accompanying statements) involving accepted guilty pleas or of the unwithdrawn guilty plea itself or the judgment entered after the plea." Neil P. Cohen et al., Tennessee Law of Evidence § 410.1, at 225-26 (3d ed. 1995); see also Tenn. R. Crim. P. 11(e)(6) (barring evidence of unsuccessful plea negotiations). Although the petitioner's guilty plea would have been admissible, it would not have been relevant to prove the state's

25

position on the petitioner's mental state at the time he shot at Mr. Boyce. "Plea bargaining is a matter which lies entirely within the prosecutor's discretion." Turner v. State, 713 S.W.2d 327, 330 (Tenn. Crim. App. 1986). The state can participate in a plea agreement for any number of reasons, one, as noted by our supreme court in State v. Mann, 959 S.W.2d 503, 510 (Tenn. 1997), being the conservation of resources. Thus, the fact that the state entered into a plea agreement with the petitioner does not indicate the state's position on the petitioner's mental state at the time he committed the offense to which he pled guilty. The petitioner has failed to show by clear and convincing evidence how he was prejudiced by his attorney's agreement to prevent the jury from learning of his guilty plea.

Based on the foregoing and the record as a whole, we affirm the trial court's denial of the petition for post-conviction relief.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
David G. Hayes, Judge

_____
L.T. Lafferty, Special Judge